No. 18,388.

JOHN A. LEE *v.* DURANGO MUSIC, ETC.

(355 P. [2d] 1083)

Decided October 17, 1960.   Rehearing denied October 31, 1960.

Messrs. FAIRFIELD & WOODS, Mr. CHARLES J. BEISE, for plaintiff in error.

Messrs. EMIGH & EMIGH, for defendant in error.

*In Department.*

Opinion by MR. JUSTICE FRANTZ.

LEE suffered adverse judgments on two claims asserted against him in one complaint. These claims arose out of the relationship of landlord and tenant. The first claim was based upon an alleged loss of business and damages sustained by the tenant, and the second upon alleged expenses to which the tenant was put in removing from the leased premises.

Judgment in the sum of $3,724.03 was entered on the first claim, and in the sum of $3,529.91 on the second, conformable to verdicts returned by the jury.

Lee was the landlord and A. C. Ruland and Lillian D. Ruland, who operated a partnership under the name of Durango Music Store, were the tenants. On the 30th day of April 1953 they entered into a written lease for a two-story building in Durango for a term commencing June 1, 1953 and ending June 1, 1956. A rental of $200.00 per month was to be paid for the premises. Copies of the lease were in possession of both parties.

Since 1946 the Rulands had been "engaged in a complete music store and electrical appliance business" in this building. At the time in question the second floor

was used by the tenants for the display and storage of second-hand equipment and used motors.

In the latter half of February 1955, Lee entered into negotiations for the letting of the upper floor, culminating during the last days of the month in a "commitment" by Lee and an acceptance by the Atlantic Refining Company. A written lease was executed by Mr. and Mrs. Lee and the Atlantic Refining Company, dated March 25, 1955, and in order to comply with the terms thereof, the Lees were required to make major alterations in the structure.

It appears that, after the "commitment" and acceptance, Lee advised Mr. Ruland of the new tenancy arrangement for the upper floor. Ruland protested, telling Lee that he was operating an expanding business and needed the space of the entire building. However, both in the pleadings and in the testimony, it is clear that Lee and the Rulands entertained an honest but mistaken belief that the written lease between them had expired and that the Rulands were occupying the premises on a month to month basis. This impression apparently existed at the time that Lee informed Ruland of the new lease of the second floor and continued until May 19, 1955.

Based upon this mutual mistake between Lee and the Rulands, Lee told the Rulands that they were to occupy the ground floor and would be charged a rental of $150.00 per month. No disagreement over this new arrangement for the ground floor was expressed by the Rulands, although they let Lee know that they were unhappy with it.

Major structural changes of the premises were commenced on March 1, 1955. A few days thereafter, the Rulands removed the appliances and other equipment from the second floor, storing some of the wares in their garage at home and others on the first floor.

As a result of the work involved in alteration of the premises, the Rulands had to operate their business

under adverse conditions. They had to contend with noise caused by power tools and by hammering and chiseling. Considerable dust resulted from the activities of the workmen remodeling the second floor and part of the first floor. Dust was a problem, because of its effect upon the fine finishes of pianos, organs, and other musical instruments, and upon the mechanisms thereof. The remodeling operation, insofar as it affected Atlantic Refining Company, was completed about the middle of May 1955.

On May 19, 1955, Mr. Ruland discovered that the written lease under which they occupied the property did not expire until June 1, 1956. Immediately upon discovering their mistake as to the date of expiration of the lease Ruland advised Lee thereof. The Rulands had paid rent for the months of March, April, May and June at the rate of $150.00 per month, the last such payment on June 4, 1955, fifteen days after the discovery of the error as to the expiration date of the written lease.

This last payment was made by Mrs. Ruland, one of the copartners (whether with knowledge of the error is not clear), and when Ruland learned that this payment had been made, he tendered to Lee an additional $200.00 to make up the difference between $200.00 and $150.00 for the months of March, April, May and June. This tender was rejected by Lee, and the contemplated remodeling of the ground floor, involving the portion being occupied by Ruland, apparently was not undertaken.

According to Ruland, he and his wife commenced looking for another location after Lee commenced remodeling the upper floor. In June 1955, they obtained a new location, and they commenced business in the new store on August 15, 1955.

The Rulands shortly thereafter filed this action against Lee. By their first claim, they sought damages for loss of business and their inability to carry on a normal business, said to result from the remodeling operation; by

their second count they alleged an eviction resulting from the deprivation of space in the leased premises, causing them expense in removing to new premises.

Lee by answer alleged an oral agreement modifying the original lease; waiver on the part of the Rulands in having accepted the remodeled building under the terms and conditions of the modified agreement; estoppel to assert an eviction, the Rulands having accepted the reduction in rent and permitted the expenditure by Lee of large sums of money in remodeling the premises. Lee counterclaimed for $300.00 as rental for the months of July and August 1955.

The Rulands by reply to the first defense alleged mutual mistake as to the term of the lease and their attempt to pay the full rental of $200.00 per month after the discovery of the error; that they did not agree to a change in the lease, and that if a modification arose it was the result of fraud by Lee in leading the Rulands to believe that the lease had expired.

As grounds for reversal, Lee asserts (A) that an estoppel applies against the Rulands, and rests his contention in this respect on five stated reasons; and that:

"B. The verdicts of the Jury on Rulands' first and second causes of action are excessive because Rulands, with a duty to minimize their damages, failed to give notice to Lee of any alleged damages caused by the remodeling, and Lee could have avoided all such damage had he received notice.

"C. The verdicts of the Jury are improper because proof of loss of gross profits does not form a proper basis for a verdict awarding damages for loss of profits, and no evidence was adduced to show the expenses of doing business."

Lee in his pleading, his proof, and in his instruction submitted to the trial court, espoused a theory of estoppel based upon the mutual mistake of the parties in believing that the lease had expired and that their acts ensued in consequence thereof. Rulands' surrender of

the upper floor, the reduction in rent and its payment, the expenditures by Lee of large sums of money in remodeling, the leasing of the second floor of the premises to Atlantic Refining Company, and other acts, are stressed as showing a changed position making properly invocable the doctrine of estoppel and its kindred canon, acquiescence.

■ May either party rely on an estoppel when they act in consequence of a mutual mistake regarding their rights? Ordinarily, a mutual mistake as to facts does not generate an estoppel. *Rockwood v. U. S.,* 39 F. (2d) 984. And it has been held that the conduct of parties resulting from a mutual mistake of their legal rights under an instrument does not *inter partes* create an estoppel. *Busby v. Busby,* 137 Iowa 57, 114 N.W. 559; *New York L. Ins. Co. v. Talley,* 72 F. (2d) 715.

Moreover, Lee would have us apply the doctrine of estoppel because the "Rulands as a matter of law are conclusively presumed to know the expiration date of the lease." Unfortunately for Lee, this presumption, if applicable, like the Roman deity Janus faces both ways. One face is directed toward Lee, the other toward the Rulands. But we believe it to be sound doctrine, applicable to this case, that where "both parties have the same means of ascertaining the truth there can be no estoppel." *Crabtree v. Winchester,* 108 Tenn. 403, 67 S.W. 797.

Lee might have found anchorage for an estoppel or an acquiescence in the testimony that a payment of $150.00 was made by Mrs. Ruland on June 4, 1955, fifteen days after Mr. Ruland read the lease and learned that it had not expired. Although this factor is mentioned in the briefs, the theory of Lee as revealed by his pleadings, his evidence and tendered instructions was basically founded on the mutual mistake of the landlord and his tenants and what they did in the light of this mutual mistake.

■ Ordinarily the knowledge of Mr. Ruland con-

cerning the expiration date of the lease would be imputed to his partner, Mrs. Ruland, and her act in making a payment of $150.00 after the acquisition of this knowledge would present a question of acquiescence in the new arrangement. Knowledge of one partner concerning the business of the partnership is knowledge possessed by all the partners. C.R.S. '53, 104-1-12.

What elements create an estoppel or an acquiescence are well established, and it is for the jury, when instructed as to what constitutes an estoppel or an acquiescence as a matter of law, to determine whether the necessary matters have been proved. *International Textbook Co. v. Pratt Merc. & Pub. Co.,* 61 Colo. 571, 158 Pac. 712. Had the case been tried on this theory and had the jury been instructed thereon, a different result might have obtained.

■ It is urged by Lee as a facet of estoppel that, because of their mutual mistake concerning the expiration of the lease, the parties modified the lease; that acts flowing from the mistake caused a change in position, and that the Rulands should be bound by the new agreement. As pointed out previously, no estoppel arises from this mutual mistake. Nor does it necessarily follow that a new contract was made. The actions of the Rulands after the discovery of the error could have been submitted to the jury under proper instructions, leaving to the jury for determination whether acquiescence in the new arrangement resulted in a modification of the lease. *Clements v. Cook,* 112 Wash. 217, 191 Pac. 874. But the case was not tried on such theory.

■ As tried on the issues presented, consonant with the theories of the parties, questions of estoppel and acquiescence were not in the case, and assertions of error in this respect are not well founded.

The second ground of error urged relates to the matter of excessive damages. It is said that the Rulands had a duty to minimize their damages. As we understand Lee's argument, he maintains the damages could have

been reduced had he been given notice that harm resulted from the remodeling operation as then conducted. Without detailing the evidence, we find no merit in this contention. Indeed, the testimony indicates that both parties acted in such manner as would keep the damages at a minimum.

■ Our resolution of the third ground of asserted error requires a somewhat extensive quotation from the record. Lee contends that there was a failure of proper proof of loss of profits. We believe this contention has merit and requires a reversal, at least as to the first count of the complaint. Gross profits do not furnish the proper basis for damages for loss of business.

Rulands' Exhibit 5, a chart, relates to five categories of merchandise. Proof of loss as to each category was identical, and hence we need only quote the record as to one of them.

Illustrative of the method of proof is the testimony concerning records. We quote:

"Q. Mr. Ruland, during this period of time, what was your average percentage of mark-up on records? A. On records for the three-year period 41.2. Q. I will now write that on the chart, 41.2 per cent. What would be the gross sales for the three-year average? A. $5,190.76. Q. And what were your gross sales of those records during 1955 for the same period? A. $4,564.13. Q. Now, did you calculate what the net loss would be, based on 41.2 per cent mark-up? A. $240.43. Q. $240.43. Now, that would have been the loss? A. Yes, that would have been loss. Q. Now, just briefly, so the jury will understand what we are getting at, would you explain how you arrived at that figure of $240.43? A. I subtracted the gross sale from the three year average, which gave me the base figure, and I took 41.2 per cent of that which gave me the figure $240.43. Q. Over this period of time you had a net profit of $240.43 less than you had during the previous three-year average? A. Gross profit."

On cross-examination of Mr. Ruland, the following testimony was elicited:

"Q. Now, will you perhaps explain to the jury what is meant by percentage of mark-up? A. To use an example, if an item cost $1.00, we would make a gross profit on that first item, records, of 41.2 per cent. Q. That indicates the various mark-ups that you gave? A. That is over the three-year average. Q. You prepared those figures yourself? A. Yes, sir. Q. I will ask you, Mr. Ruland, if those figures are made to apply only to the months of March, April, May, June, and July of 1955? A. This column here applies to 1955. Q. Yes, but I am specifically inquiring about what period the percentages apply. A. I applied the percentage to the difference of our loss in sales and come up with the net gross loss."

Again, Mr. Ruland testified:

"Q. Now, Mr. Ruland, for the period involved, as shown by Exhibit Number 5, did you deduct from the gross receipts for the period involved, and as prepared from your ledger and work sheets, the gross expenses of the business in arriving at a figure for average profits? A. No, sir. That does not appear on this 'Loss of Business.' "

At the conclusion of the trial, Lee moved the court to remove from the consideration of the jury the question of damages relating to loss of profits, on the theory that there had been a failure of proof, in that the only evidence disclosed by the record then made concerned the loss of gross profits. This motion was denied.

■ Damages sustained by a business must relate to loss of net profits; they may not be speculative, remote, imaginary, or impossible of ascertainment. *Boyle v. Bay,* 81 Colo. 125, 254 Pac. 156. Such profits are anticipated profits which have their foundation in the past experience of the concern said to have suffered the loss. *Boyle v. Bay,* supra; *Milheim v. Baxter,* 46 Colo. 155, 103 Pac. 376, 133 Am. St. Rep. 50.

*Morrow v. Missouri Pac. Ry. Co.,* 140 Mo. App. 200, 123 S.W. 1034, contains language that is at once expositive and pertinent. The court points out that "the loss of profits from the interruption of an established business may be recovered where the plaintiff makes it reasonably certain by competent proof what was the amount of his profits," as an exception to the general rule that remote and speculative damages may not be recovered. "His case would fall within the reason and principle of the general rule, and not within the exception," if he failed to present such proof.

The court says that "the word 'profits' has a fixed and definite meaning. It means the net earnings, or the excess of returns over expenditures, and relates to any excess which remains after deducting from the returns the operating expenses and depreciation of capital, and also, in a proper case, interest on the capital employed. 'Profit,' in the ordinary acceptation of the law, is the benefit or advantage remaining after all costs, charges, and expenses have been deducted from the income, because, until then, and while anything remains uncertain, it is impossible to say whether or not there has been a profit. * * * In the case under consideration, the amount of plaintiffs' recovery would be the net profits of their milling business during the period of about 11 days that the mill was compelled to remain idle."

In discussing the evidence considered in that case the court commented: "Such books would contain record entries of the business, an itemized account of the amount of the gross receipts, and the amount of expenditures and the capital invested. Yet in this case no such books were produced in evidence, but the evidence of profits rests wholly upon a statement of a lump sum by one of the plaintiffs in the case."

Before concluding our discussion of this decision, we adopt as applicable to this case the following: "As we have seen, the reason why an established business is excepted from the general rule is that it has in its power

to prove the capital invested, the amount of monthly and yearly expenses of operating the business, and the monthly or yearly income derived from it for a period prior to the interruption. The expenses of the business, including depreciation of capital, deducted from its income for a few months or years prior to such interruption, produces the customary net profits of the business during that time, and from this fixed data and these facts an estimate can be made of the plaintiffs' loss during the period the business was interrupted. Nothing of this kind is shown in the evidence to have taken place. No reliable basis was given to the jury by actual estimate of the previous conditions and profits of the business."

Other cases which are instructive on the question are: *Terre Haute Brewing Co. v. Dwyer,* 116 F. (2d) 239; *North v. Byrnes,* 183 Okla. 321, 82 P. (2d) 678, 117 A.L.R. 1269; *St. Germain v. Bakery & Confectionery Workers Union,* 97 Wash. 282, 166 Pac. 665, L.R.A. 1917 F 824.

■ Mr. Justice Knauss expounded the same doctrine regarding loss of business in *Lockwood Corp. v. Bockhaus,* 129 Colo. 339, 270 P. (2d) 193. This case is authority for the proposition that proof of loss of gross profits does not afford the proper basis for damages based on loss of profits; that expenses of operation must be shown in order to establish net profits, which do form the proper basis for proof of such damages.

The judgment is affirmed as to the second count, reversed and remanded as to the first count with directions to grant a new trial on the question of damages from loss of profits only.

Mr. Justice Knauss and Mr. Justice Doyle concur.