**WESTERN CITIES BROADCASTING, INC., Petitioner,**

v.

**William J. SCHUELLER d/b/a Eldorado Communications, Respondent.**

No. 91SC790.

Supreme Court of Colorado, En Banc.

March 29, 1993.

Rehearing Denied April 19, 1993.

Astrella & Rice, P.C., Lance Astrella, T.R. Rice, Denver, for petitioner.

Cantrick and Rees, P.C., David K. Rees, Denver, for respondent.

Justice SCOTT delivered the Opinion of the Court.

This dispute arises out of a lease agreement between a radio station, the lessee, and the operator of a radio communications facility, the lessor. Alleging fraud and negligent misrepresentation in the formation of the lease, the radio station, Western Cities Broadcasting, Inc. (Western Cities), affirmed the agreement and sued for damages. The defendant, William J. Schueller (Schueller), counterclaimed, asserting Western Cities breached the lease agreement. After a jury verdict for Western Cities, the district court awarded the radio station $3.74 million in damages. On appeal, the court of appeals reversed and remanded to the district court with directions to vacate portions of the judgment because, the court held, the evidence presented was speculative and insufficiently certain or reliable, as a matter of law, to enable the trier of fact to arrive at a fair approximation of damages. *Western Cities Broadcasting, Inc. v. Schueller*, 830 P.2d 1074 (Colo.App.1991). We granted certiorari to determine whether Western Cities introduced evidence sufficient to prove damages. We affirm the judgment of the court of appeals.

## I.

In 1985, Western Cities, a Delaware corporation licensed to do business in Colorado, purchased a Longmont radio station, KLMO–FM, for $5.5 million. Western Cities changed the station's format to contemporary music and changed the call letters to KQKS. In January of 1987, after encountering problems with signal interference at its initial broadcast site, Lee Hill in Boulder, Western Cities entered into a written lease agreement with Schueller, the operator of a radio communications tower located on Eldorado Mountain in Jefferson County, Colorado. In addition to paying monthly rent, Western Cities agreed that prior to September 1987 it would design, construct, and install a "multiple systems antenna" (MSA), an antenna that permits several different radio stations to broadcast from the same radio tower. Western Cities also agreed that this MSA would accommodate KBCO, another radio station using the tower, and that the new antenna would be equal to the technical standards of KBCO's existing antenna.[1] Finally, Western Cities agreed to remove trash from the site on the same day it was generated.

Between the months of January and April of 1987, Western Cities designed an MSA for the tower, and on April 28, 1987, Western Cities filed an application with the FCC to obtain permission to begin construction. KBCO, however, determined that the antenna designed by Western Cities would degrade its signal and filed an objection with the FCC on June 15, 1987. In July of 1988, almost a year after it was to have installed the MSA under the lease, Western Cities abandoned its proposal to build the MSA. At the same time, Western Cities filed an application to operate permanently from the existing tower. The FCC approved the application in December of 1988.

Without the MSA Western Cities agreed to install under the lease, the broadcast power of KQKS was limited. Instead of broadcasting at 100 kilowatts, the range of most full-power FM stations, KQKS was limited to approximately 5 kilowatts, and KQKS's broadcasts, therefore, reached only a small part of the Denver market. Meanwhile, despite its limited power, it is undisputed that KQKS's transmissions interfered with the signals of others using the tower. Uncontroverted testimony at trial indicated that KQKS's broadcasts caused substantial interference to radio transmissions by others using the site, in derogation of Western Cities' duties under the terms of the lease.

Believing Western Cities to be in breach, in July of 1988, Schueller served Western Cities with a three-day notice and demand for possession of the leased premises, asserting that Western Cities had failed to construct the MSA, failed to remove the trash it generated on the site, and failed to minimize its interference with other users. In response, Western Cities filed an action in district court to obtain an injunction against eviction and a determination of the parties' rights under the lease.

Ten days after serving the notice and demand for possession, Schueller filed a forcible entry and detainer (FED) action in county court seeking possession of the premises, costs, and attorney fees. Western Cities then filed an action in the district court asserting fraud and negligent misrepresentation.[2] Specifically, Western Cities alleged Schueller falsely represented that (1) he owned the antenna tower located on his land; (2) the tower was designed and constructed with sufficient strength to sup-

---

1. Though Western Cities contends it did not know it at the time it entered the lease agreement, KBCO actually owned the tower on which the MSA was to be built. Schueller had previously entered into a lease agreement with KBCO whereby KBCO would build a 180–foot tower to replace the existing tower; KBCO would own the tower and broadcast from it pursuant to a twenty-year lease; and at the end of the lease, the tower would become Schueller's property. In the interim, and at all times material here, Schueller owned the exclusive rights to lease space on the tower to third parties.

2. Though these claims are compulsory counterclaims, Western Cities filed in district court because the amount in controversy exceeded the then jurisdictional limit ($5000) of the county court. *See* C.R.C.P. 313(b)(1).

port an MSA as referred to in the lease; and (3) if Western Cities placed its temporary antenna on the tower in the location designated by Schueller, the interference with other signals would be minimal. Schueller answered the complaint, denying liability, and asserted counterclaims for breach of contract, seeking money damages.

These actions were consolidated in the district court pursuant to a motion by Western Cities, and a jury trial commenced on April 24, 1989. At trial, Western Cities introduced the expert testimony of Dr. Dennis Peseau, an econometrician.[3] Dr. Peseau testified as to the market value that station KQKS would have attained had Schueller's representations actually been true. Schueller objected that Peseau should not be allowed to testify since Western Cities failed to present sufficient evidence of a nexus between the alleged misrepresentations and the hypothetical value of the station. The trial court overruled Schueller's objection and allowed Peseau's testimony. In an effort to explain the basis for his testimony and the value he attributed to station KQKS, Peseau described six different hypothetical models. Five of the models, Peseau testified, relied on *Duncan's Radio Market Guide* or similar trade publications that indicate the past operational experiences of other FM radio stations operating at full power in Denver.[4] He opined that such a station would be worth between $9.3 million and $17.8 million. He also asserted that a station such as KQKS, operating at only 5 kilowatts, would be worth nothing. Using these hypothetical models based on trade publications, not KQKS's specific operational experience, Peseau further concluded that KQKS lost profits for the period of 1987–1989 in the amount of $3.4 million.

After a nine-day trial, the jury (1) awarded Western Cities $4.65 million on its claim

of negligent misrepresentation, but found Western Cities to have been 41% contributorily negligent; (2) awarded Western Cities $2.74 million and $1 million exemplary damages on its claim of fraud; and (3) awarded Schueller $400,000 and attorney fees on his action for breach of contract.

The trial court, however, determined that the two awards, one for fraud and the other based on negligent misrepresentation, would constitute a double recovery and thus granted Western Cities $2.74 million in compensatory damages and $1 million in exemplary damages. The court upheld the jury verdict of $400,000 in favor of Schueller on his breach of contract counterclaim, and awarded him $150,000 in attorney fees and possession of the property.

Western Cities and Schueller subsequently filed motions for amended judgment and judgment notwithstanding the verdict, respectively. Both motions were denied. Schueller appealed and Western Cities cross-appealed. The court of appeals affirmed the judgment in favor of Schueller on breach of contract, attorney fees, and possession of the property, but reversed the judgment in favor of Western Cities, ruling that the district court erred in failing to grant Schueller's motions for directed verdict and judgment notwithstanding the verdict. With respect to the claim of fraud, the court of appeals questioned the reliability of the methods utilized for valuation of the station, and found that evidence of the projected value was "insufficiently certain or reliable, as a matter of law, to enable the trier of fact to arrive at a fair approximation of the value of the leasehold either as it was represented or as it was conveyed by Schueller under the terms of the lease agreement." *Western Cities Broadcasting, Inc.*, 830 P.2d at 1078. With regard to the claim of negligent misrepresentation, the court found that West-

---

3. Peseau described his field as "the mathematical and statistical study of using data such as interest rates, gross national product, economic data, and applying statistical and mathematical tools to them so that one can make predictions or forecast or attempt to examine economic behavior or what makes an economy tick...."

4. Peseau described this guide as a "data and research service organization subscribed to nationally by most of the radio industry," containing "infinite detailed information [including a station's minimum value] on every radio station in a major market ... throughout the United States."

ern Cities failed to present sufficiently reliable evidence of lost profits to allow the question to go to the jury. *Id.* at 1079.

Following denial of Western Cities' petition for rehearing, we granted certiorari to determine if the court of appeals applied the appropriate standard for proving damages.[5]

## II.

A plaintiff who has been fraudulently induced to enter a contract may either rescind the contract or affirm the contract and recover in tort for the damages caused by the fraudulent act. *Trimble v. City & County of Denver*, 697 P.2d 716, 723 (Colo.1985). The plaintiff has the burden of proof and "must establish by a preponderance of the evidence that he has in fact suffered damage and that the evidence introduced provides a reasonable basis for a computation of damages." *Pomeranz v. McDonald's Corp.*, 843 P.2d 1378, 1381 (Colo.1993) (citing *Riggs v. McMurtry*, 157 Colo. 33, 39, 400 P.2d 916, 919 (1965)); *see also, Tull v. Gundersons, Inc.*, 709 P.2d 940 (Colo.1985). Where the subject of a fraud is a conveyance of property, a plaintiff electing to affirm the contract is entitled to receive the benefit of the bargain, i.e., the difference between the value of the property as represented and the actual value of the property as received. *Farmer v. Norm "Fair Trade" Stamp, Inc.*, 164 Colo. 156, 160, 433 P.2d 490, 491 (1967); *see also Slack v. Sodal*, 190 Colo. 411, 413, 547 P.2d 923, 924 (1976). An essential element of such an award is actual damage. This damage "cannot be based on mere speculation or conjecture," but "once the fact of damage has been established with the requisite degree of certainty, uncertainty as to the amount of damages will not bar recovery." *Tull*, 709 P.2d at 943.

In the instant case, Western Cities elected to affirm the lease agreement and seek

benefit of the bargain recovery. The jury awarded damages of over $3.7 million, but the award was vacated by the court of appeals. Western Cities argues that in vacating the jury award the court of appeals altered the standard for proof of damages set forth in *Tull* by requiring that the precise amount of damages be proved.

This argument misinterprets our holding in *Tull* and mischaracterizes the holding of the court of appeals. In *Tull* we held that "[a]lthough an award of damages cannot be based on mere speculation or conjecture, once the fact of damage has been established with the requisite degree of certainty, uncertainty as to the amount of damages will not bar recovery." *Tull*, 709 P.2d at 943. As we recently explained in *Pomeranz*, a plaintiff will not be barred from recovery for failing to prove the amount of loss with mathematical certainty, but the "rule of certainty" requires a reasonable degree of persuasiveness in the proof of the fact of damages or injury. *Pomeranz*, 843 P.2d at 1382.

Here, although the court of appeals was "not persuaded" that the econometric projections were "sufficiently reliable" to prove the value of the radio station, *Western Cities Broadcasting, Inc.*, 830 P.2d at 1078, the principal justification for the ultimate conclusion of the court of appeals is that "no evidentiary basis was provided by which the fact-finder could derive the value of the leasehold from the projected value of the radio station." *Id.* In other words, although Western Cities may have proved the value of its business, radio station KQKS, it failed to prove that the value of the business had any bearing on the value of the leasehold. This conclusion follows the well-established principle that in computing the value of real property, the value of the realty must be separated from the value of the business. *See Denver Urban Renewal Authority v. Cook*, 186 Colo. 182,

5. As stated in the order for certiorari, the specific issue for review is as follows: Whether the burden of establishing and proving damages announced by the court of appeals is in conflict with the burden previously set forth by the Supreme Court in *Tull v. Gundersons, Inc.*, 709

P.2d 940 (Colo.1985), and if so, whether the court of appeals erred in determining that there was no evidentiary basis connecting the value of the leasehold to the value of the business such that the jury could have adequately ascertained the amount of damages incurred.

184, 526 P.2d 652, 653 (1974). The rationale behind this rule is that the value of the business, especially a new concern, is primarily a reflection of the entrepreneurial skills of management, rather than the value of the land. *Id.*

■ The facts support the conclusion reached by the court of appeals. Western Cities submitted no evidence regarding the value of the lease as represented or as received. Instead, it presented the testimony of the econometrician, Dr. Peseau, who utilized a radio trade publication to create six different models to determine the market value of a hypothetical radio station operating at full power in Denver. Based solely upon these models, and without considering the way KQKS was managed, its earnings history, or its business efficiency, Peseau concluded that the value of KQKS would be between $9.3 million and $17.8 million, had the lease agreement not been misrepresented. Dr. Peseau's testimony regarding a hypothetical FM station has little or no relevance to the actual value of KQKS and less relevance to the actual value of the leasehold.[6]

The holding of the court of appeals in no way undermines our opinion in *Tull.* Without any evidence of the value of the leasehold, either as represented or as received, there is no basis upon which a jury could with reasonable certainty compute the damages in this case. Therefore, with regard to Western Cities' claim of fraud against Schueller, we affirm the holding of the court of appeals that the proffered evidence was insufficient as a matter of law to establish the value of the leasehold interest.

## III.

■ Damages recoverable for negligent misrepresentation include (1) the difference between the value of what the plaintiff received and its purchase price or other value given for it (out-of-pocket expenses); and (2) other pecuniary loss suffered as a consequence of the plaintiff's reliance upon the misrepresentation (consequential damages). *Robinson v. Poudre Valley Fed. Credit Union,* 654 P.2d 861, 863 (Colo.App.1982); Restatement (Second) of Torts § 552(B)(1). In Colorado, we recognize the tort of negligent misrepresentation as providing a remedy in cases involving money losses due to misrepresentation in a business transaction. *Bloskas v. Murray,* 646 P.2d 907, 914 (Colo.1982). At trial, Western Cities sought consequential damages, including lost profits, but did not seek out-of-pocket expenses.[7]

■ Western Cities contends that in vacating the damage award for negligent misrepresentation, the court of appeals introduced a per se rule holding that prior profitability is a prerequisite to an award of lost profits. We agree there is not a per se rule requiring a showing of past profits, but there can be no question that such evidence, or the lack thereof, is highly relevant to the issue of lost profits. Damages for lost profits "have their foundation in the past experience of the concern said to have suffered the loss." *Lee v. Durango Music,* 144 Colo. 270, 278, 355 P.2d 1083, 1087 (1960); *see also Tull,* 709 P.2d at 945 (evidence of past performance will form the basis for a reasonable prediction of profits).

■ Here, the court of appeals correctly noted that Western Cities had "no history

---

**6.** By our decision today we do not hold that the testimony of an econometrician or other financial expert is not admissible to determine the value of a business or the fair market value of business property, such as a leasehold. We have previously noted the importance of expert testimony to establish the value of an interest in real estate. *Denver Urban Renewal Authority v. Berglund–Cherne Co.,* 193 Colo. 562, 566, 568 P.2d 478, 483 (1977). Expert opinion evidence that relies upon generally accepted techniques or methods used in the financial community at large is admissible to establish proof of value. However, to be proof sufficient to sustain the

plaintiff's burden of proof, the offered testimony must relate to both the fact of the injury and the amount of the plaintiff's loss. *Pomeranz,* 843 P.2d at 1381; *Tull,* 709 P.2d at 945.

**7.** The trial court instructed the jury as follows:

If you find in favor of the Plaintiff [Western Cities] on its claim of negligent misrepresentation, you shall award as his actual damages:

The pecuniary losses suffered by Plaintiff as a result of such representation, including but not limited to loss of profits.

of prior profitability" and had "never operated at a profit under its present ownership." *Schueller*, 830 P.2d at 1079. The court did not, however, adopt a per se rule requiring a showing of past profits. The court properly recognized that lost profits are not available if they are speculative, remote, imaginary, or impossible of ascertainment, *see Durango Music*, 144 Colo. at 278, 355 P.2d at 1087, and vacated the trial court's award based on that standard. *See also Cope v. Vermeer Sales & Serv. of Colo.*, 650 P.2d 1307, 1309 (Colo.App.1982) (test for admissibility of evidence of lost profits is whether the profits are "reasonably certain by competent proof").

The instant case is distinguishable from *Cope*, a case relied upon by Western Cities. In *Cope*, the court of appeals reversed the trial court's grant of a motion in limine excluding evidence of lost profits claimed by a start-up business. *Cope*, 650 P.2d at 1309. The plaintiff in *Cope*, a start-up business specializing in the sale of specimen trees, presented evidence that it had already obtained a probable buyer for a portion of its product when the defendant's negligent act caused the plaintiff to be unable to secure the trees which it was to sell.[8] *Id.* at 1308. In *Cope*, the plaintiff's business opportunity was real, tangible and one which was founded on the actual activities or past experience of the plaintiff's particular business.

In contrast, the only evidence Western Cities presented regarding lost profits was the testimony of Dr. Peseau, who based his calculations on a hypothetical FM radio station operating at full power in the Denver area. The position advanced by Western Cities would have us accept as the measure of damages, the difference between the profits a hypothetical station would make and the amount of profit actually made by KQKS (none). By that calculation, Peseau concluded that Western Cities was entitled to $3.4 million in lost profits. Such evidence, based on a non-existent firm, is too speculative to establish Western Cities' claimed damages. If we were to accept petitioner's logic, through this suit, Western Cities could essentially effect a forced sale of its business, without a transfer of assets, at a price or value it has never attained. Given the fact that the actual station, KQKS, had no significant past operating history, had never made a profit before, had failed to provide evidence of actual lost business opportunities, and could provide no evidence other than Peseau's hypothetical models, we do not believe the court of appeals erred in finding this evidence too speculative to go to a jury. The court's holding properly recognizes the failure of Western Cities to produce evidence of its business experience or past profits; it does not introduce, nor do we recognize, a per se rule requiring a showing of past profitability in order to award lost profits.[9]

## IV.

Western Cities did not present evidence of the value of its lease agreement with William Schueller, either as represented or as received, and it did not show out-of-pocket expenses resulting from Schueller's alleged misrepresentation. Instead, it provided evidence of the value of a business, a

---

8. In *Cope*, the plaintiff also submitted proof that he was unable to obtain specimen trees from any other source in time to deliver the trees to his buyers. *Cope*, 650 P.2d at 1308. In the instant case, neither party submitted evidence regarding the availability of other sites from which KQKS could broadcast.

9. We also reject the added contention by Western Cities that as a matter of policy, the court of appeals holding discourages start-up businesses by providing little incentive for sellers to such businesses to be diligent in their dealings with new firms. Nothing in this holding in any way discourages or prevents start-up businesses from claiming out-of-pocket expenses. Nor do we hold that a new business cannot prove lost profits assuming it can establish with reasonable certainty the amount of future damage related to actual operations (though over a necessarily limited time) or to real, particular transactions. The rule advocated by Western Cities would create an absurd result, whereby start-up businesses could win huge awards for contract breaches having little or no bearing on the company's actual or real potential for profitability, which profitability is most frequently related to the entrepreneurial skills of its management and not the hypothetical value of its real estate interests.

 

hypothetical radio station operating in the Denver market at full power, and the profits such a business would earn. This evidence has no bearing on the value of the leasehold at issue or on the claimed loss of profits. To conclude that Western Cities is entitled to the value of this hypothetical station and its profits requires speculation and conjecture which are not permissible under our current law. We therefore affirm the judgment of the court of appeals and return this case to the court of appeals for remand to the district court with directions to vacate the awards in favor of Western Cities on its claims of fraud and negligent misrepresentation.