LIFE CARE CENTERS OF AMERICA, INC. and American Lifestyles, Inc., Plaintiffs–Appellants and Cross–Appellees,

v.

EAST HAMPDEN ASSOCIATES LIMITED PARTNERSHIP, Cheyenne Associates Limited Partnership, John W. Galston, Eugene H. Rosen, Bruce Weinstein, LPIMC, Inc., and Integon Life Insurance Corporation, Defendants–Appellees and Cross–Appellants.

Nos. 93CA0222, 93CA0581.

Colorado Court of Appeals, Div. II.

March 23, 1995.

Rehearing Denied April 20, 1995.

Certiorari Denied Oct. 2, 1995.

Jean E. Dubofsky, P.C., Jean E. Dubofsky, Boulder, Jones, Day, Reavis & Pogue, Timothy B. Dyk, Jeffrey S. Sutton, Gregory A. Castanias, Washington, DC, for plaintiffs-appellants and cross-appellees.

Holland & Hart, John C. Tredennick, Jr., Denver, Owens, Clary & Aiken, L.L.P., Leighton Aiken, Dana M. Campbell, Dallas, TX, for defendants-appellees and cross-appellants.

Opinion by Judge PLANK.

Plaintiffs, Life Care Centers of America, Inc., and American Lifestyles, Inc., (collec-

tively, Life Care) appeal the judgment entered on a jury verdict awarding $6 million to East Hampden Associates Limited Partnership (East Hampden) on its breach of fiduciary duties counterclaim, $2 million on its breach of contract counterclaim, $6 million in punitive damages, and the trial court's award of more than $2.1 million in prejudgment interest to East Hampden. Life Care also appeals the jury's rejection of its breach of contract claim against East Hampden, Cheyenne Associates Limited Partnership (Cheyenne), LPIMC, Inc., the general partner of East Hampden and Cheyenne, and the officers of LPIMC, John W. Galston, Eugene H. Rosen, and Bruce Weinstein. We affirm in part, reverse in part, and remand with directions.

In 1987, East Hampden purchased a nursing home, Cherry Creek Nursing Center (Cherry Creek Nursing). At that time, Cherry Creek Nursing primarily offered skilled nursing care but also provided assisted living services and specialized care for persons suffering from Alzheimer's disease. One of East Hampden's predecessors in interest had contracted with Life Care to manage Cherry Creek Nursing, and Life Care continued to manage the facility after it was purchased by East Hampden. Pursuant to this management agreement, Life Care was responsible for the day-to-day operations of Cherry Creek Nursing.

Life Care was also the managing agent for Cheyenne Place Retirement Center (Cheyenne Place) and the Cheyenne Mountain Nursing Center (Cheyenne Nursing), which were owned by Cheyenne. Cheyenne Place offered an independent living environment for retired persons and Cheyenne Nursing offered assisted living services and skilled nursing care.

During Life Care's management of Cherry Creek Nursing, Life Care's chairman of the board and sole shareholder, Forrest Preston, helped develop two facilities, Cherry Creek Retirement Village (CCRV) and Garden Terrace, in which he had an ownership interest. Life Care was also retained as the managing agent for both of these facilities. CCRV was constructed on land adjacent to Cherry Creek Nursing and offered assisted living services and independent retirement living. Garden Terrace was located a few miles from Cherry Creek Nursing and specialized in the treatment of Alzheimer's disease.

In April 1991, East Hampden terminated its contract with Life Care based on its conclusion that Life Care had fiscally mismanaged Cherry Creek Nursing and had misappropriated key business opportunities by its operation of CCRV and Garden Terrace. In addition, Cheyenne terminated its relationship with Life Care with respect to the two facilities it owned.

Life Care initiated this action against both East Hampden and Cheyenne for breach of contract. East Hampden and Cheyenne filed counterclaims against Life Care for breach of its fiduciary duties and East Hampden filed a counterclaim for breach of contract based on Life Care's failure to maximize Medicare reimbursement and its failure to seek Medicaid certification for Cherry Creek Nursing. After an 11–day trial, the jury found against Life Care on its breach of contract claims and in favor of East Hampden and Cheyenne on their counterclaims.

## I.

Life Care contends that its management of other long-term care facilities in the Denver area was not, as a matter of law, a breach of its fiduciary duties to East Hampden. We are not persuaded.

### A.

The relationship between Life Care and East Hampden was governed by the management agreement that East Hampden's predecessor in interest had entered into with Life Care. This agreement provided that Life Care was to be the agent of the owner of Cherry Creek Nursing. Furthermore, at trial, Preston testified that Life Care was an agent of East Hampden and that Life Care owed East Hampden duties of trust, loyalty, honesty, a duty to look after the best interests of East Hampden, and a duty to maximize the profits of Cherry Creek Nursing.

Life Care tendered an instruction, given to the jury, based on Restatement (Second) of

Agency § 393 (1958). This instruction provided:

It is a breach of fiduciary duty to compete with [the] principal with respect to the subject matter of the agency unless the principal understands that the agent is to compete or a course of dealing between the agent and the principal indicate that this is understood.

## B.

■ Initially, we reject Life Care's contention that it did not breach its fiduciary duties to East Hampden because it was not East Hampden's exclusive agent.

Life Care relies on Restatement (Second) of Agency § 394 comment b (1958) which provides:

The agent commits no breach of duty by acting for competitors if, at the time of his employment, the principals have reason to know that the agent believes that he is privileged to do so.

Life Care further asserts that the following illustration, set out that Restatement comment, is on "all fours" with this case:

P, a manufacturing company, enters into a contract with A, another corporation, the business of which is representing manufacturers. By terms of the contract A is to have the exclusive agency to sell P's products. A makes other similar contracts with competing manufacturers. In the absence of further facts, A thereby commits no breach of duty to P.

Life Care did not submit an instruction based on these authorities to the trial court. Moreover, as these authorities make clear, the determination of the nature and scope of an agency relationship is inherently factual.

The evidence concerning the relationship between East Hampden and Life Care was extensive and at times conflicting. The mere fact that East Hampden may have known that Life Care operated other health care facilities in the Denver area was not dispositive as to whether Life Care breached its fiduciary duties to East Hampden. Life Care could have operated other long-term care facilities in the Denver area in such a manner that it did not breach these duties.

Therefore, under these circumstances we cannot determine, as a matter of law, that Life Care did not breach its fiduciary duties to East Hampden.

## C.

■ Next, we reject Life Care's argument that it did not breach its fiduciary duties to East Hampden because East Hampden consented to the competition.

The evidence concerning what East Hampden knew and whether it had consented to Preston's development of CCRV and Garden Terrace and Life Care's management of these facilities was disputed. The jury, in concluding that Life Care breached its fiduciary duties to East Hampden, implicitly rejected Life Care's arguments that East Hampden had agreed to or consented to Life Care's management of CCRV and Garden Terrace. The jury's conclusion is supported by the record and, accordingly, will not be disturbed on appeal. See Nutting v. Northern Energy, Inc., 874 P.2d 482 (Colo.App. 1994).

## D.

■ We also reject Life Care's contention that the trial court erred in failing to instruct the jury, as an affirmative defense to East Hampden's breach of fiduciary duties counterclaim, that there was an understanding or a course of dealing between the "original owner" of Cherry Creek Nursing and Life Care that Life Care could manage "other facilities" in Denver.

The instruction tendered by Life Care was based on Restatement (Second) of Agency § 393 comment a (1958) which provides that:

There is no violation of the agent's duty if the principal understands that the agent is to compete; a course of dealing between the parties may indicate that this is understood.

In rejecting Life Care's tendered instruction, the trial court stated that:

This is not a course of dealing case. It's a case about notice and estoppel, and that's

the way it's been tried and that's the way it will be presented to the jury.

We agree that the trial court properly rejected Life Care's tendered instruction as it was incorporated in other instructions given by the court. The trial court, as noted previously, gave Life Care's tendered instruction that an agent does not breach its fiduciary duties if the agent competes with the principal and "the principal understands that the agent is to compete or a *course of dealing* between the agent and the principal indicate that this is understood." (emphasis added) The jury was also instructed that: "One who is assigned the rights under a contract stands in the same position as the assignor and has no better rights than the assignor."

Based upon these instructions, if the jury determined that the "original owner" of Cherry Creek Nursing had consented to or agreed to competition, it necessarily would have found that East Hampden assumed the management agreement subject to such consent. Therefore, under these circumstances, the trial court did not err by not submitting Life Care's tendered instruction to the jury.

## II.

■ Life Care also contends that the trial court erred in allowing East Hampden and Cheyenne to assert as an affirmative defense to its breach of contract claim Life Care's solicitation of the limited partners of each partnership. Under the circumstances presented here, we disagree.

At the outset, we will consider the propriety of the solicitation defense as to Cheyenne Nursing only. Unlike Cheyenne Place and Cherry Creek Nursing, for which the jury found against Life Care on other affirmative defenses, the solicitation defense was the sole affirmative defense asserted by Cheyenne Nursing to Life Care's breach of contract claim.

Life Care began soliciting the limited partners of Cheyenne in the summer of 1991 to obtain their consent to replace LPIMC with itself as the managing general partner. On July 15, 1991, LPIMC informed Life Care that it was terminating the management

agreement effective July 22, 1991, as a result of Life Care's breach of its contractual and fiduciary obligations owed to Cheyenne by its solicitation of the limited partners and its failure to cure within a reasonable time.

In determining what fiduciary duties Life Care owed Cheyenne with respect to its solicitation of the limited partners, the trial court relied on *Treadway Cos. v. Care Corp.*, 638 F.2d 357 (2d Cir.1980). In *Treadway*, two directors of Treadway, which was targeted for takeover by Care Corporation, were also officers in Care Corporation. The court held that the directors did not breach their duties of loyalty to Treadway by seeking a change in the incumbent management because there was no actual conflict between the interests of the two companies and the takeover was not adverse to the best interests of Treadway.

The trial court, relying on *Treadway*, substantially adopted Life Care's argument on summary judgment concerning the solicitation issue, ruling:

Just as the agent of a corporation generally owes a duty to the corporation (including management) and its shareholders, the agent of a limited partnership owes a duty to the limited partnership (including its managing general partner) and its limited partners.

However, the Court finds that in the event that the interests of the partnership's incumbent management and its limited partners conflict, an agent, in an attempt to serve the best interests of the partnership and its limited partners, may take action which may not be in the best interest of present management.

Upon an expedited motion for reconsideration of its decision granting summary judgment in favor of Life Care on the solicitation issue, the trial court reversed its ruling finding that material questions of fact were present regarding: (1) whether a conflict existed between the LPIMC and the limited partners of Cheyenne; and (2) whether Life Care was seeking to serve the best interests of Cheyenne.

Life Care subsequently argued that the sole issue that should be submitted to the

jury was whether its solicitation of the limited partners was in the best interests of the partnership. Life Care objected to the additional requirement that there be a conflict of interest between the general partner and the limited partners at the time the solicitation was made.

Life Care, however, tendered an instruction that was ultimately given to the jury. This instruction followed the trial court's ruling on summary judgment and provided:

> In the event that the interests of a partnership's incumbent management and its limited partners conflict, an agent, in an attempt to serve the best interests of the partnership and its limited partners, may take action which may not be in the best interests of incumbent management. In a limited partnership, it is the general partner(s) which manages the partnership.

Subsequently, during the hearing on instructions, Life Care reiterated its prior objections, in essence objecting to its own tendered instruction. Thus, even if we agree with Life Care's position on appeal that the trial court impermissibly added an additional requirement, we conclude that Life Care by its summary judgment position and by tendering the instruction set forth above was precluded from any objection it may have had to the added element that there be a conflict of interest between the general and limited partners. *See Caldwell v. Kats*, 193 Colo. 384, 567 P.2d 371 (1977) (even if verdicts were inconsistent, they were permitted under instructions submitted by parties, so judgment will not be reversed).

Therefore, the trial court did not err in permitting Cheyenne Place to raise Life Care's solicitation as an affirmative defense and in instructing the jury as set forth above.

## III.

Life Care asserts that the awards for compensatory damages are not supported by sufficient evidence of causation, are duplicative, and are improper because the awards include damages for the period after East Hampden terminated the management agreement with Life Care and after Life Care could have unilaterally terminated the contract. We agree in part.

### A.

Life Care first contends that East Hampden failed to show adequate causation of damages. We disagree.

■ To recover damages for future lost profits, the party seeking such damages must establish with reasonable, but not necessarily mathematical, certainty both the fact of the injury and the amount of the loss. Sufficient evidence must be presented to compute a fair approximation of the loss. *Pomeranz v. McDonald's Corp.*, 843 P.2d 1378 (Colo.1993). Lost profits may not be awarded if they are speculative, remote, imaginary, or impossible to ascertain. *Western Cities Broadcasting, Inc. v. Schueller*, 849 P.2d 44 (Colo.1993). The damages awarded must be "traceable to and [must be] the direct result of the wrong to be redressed." *Graphic Directions, Inc. v. Bush*, 862 P.2d 1020, 1025 (Colo.App.1993).

■ East Hampden presented testimony on damages, in part, through an expert witness in the field of economic analysis and the financial aspects of the nursing home industry. In determining the damages East Hampden incurred because of competition from CCRV and Garden Terrace, East Hampden's expert testified that he calculated the amount of net income that each patient generated based on the historical records of Cherry Creek Nursing regarding revenues and costs. He then estimated the number of patients that Cherry Creek Nursing would lose as the result of continued competition from CCRV and Garden Terrace and calculated the total damages by multiplying that number with the net income per patient.

Life Care contends that these calculations were deficient because the assumptions relied upon by East Hampden's expert failed to establish causation. In addition, Life Care asserts that East Hampden's expert failed to account for the undisputed benefit of having CCRV next door, failed to account for property-related expenses, and erroneously assumed that East Hampden was entitled to recover all damages resulting from any decline in the number of Alzheimer and assist-

ed-living patients at Cherry Creek Nursing solely from Life Care. We are not persuaded that these alleged errors require reversal.

Because the damages calculations were based on historical revenues and costs, and because the underlying assumptions concerning patient loss, growth rates, and the effects of adverse competition from CCRV and Garden Terrace have support in the record, we conclude that the calculations are reasonable and could be determined by the jury to be a valid means for determining damages.

### B.

■ Life Care next contends that the jury's award of damages on East Hampden's Medicaid certification counterclaim are duplicative. We agree.

East Hampden's own expert on damages testified that the damage calculations for the breach of fiduciary duties and Medicaid certification counterclaims were mutually exclusive. He stated that, if Life Care had not competed for patients, there would not have been a need for Life Care to recommend Medicaid certification and, hence, no damages on the Medicaid claim would have been appropriate.

■ We reject East Hampden's argument that Life Care waived any objection because it did not request an instruction that, if the jury awarded damages on the breach of fiduciary duty counterclaim, it was not to award damages on the Medicaid counterclaim. Because the award is without support in the record, we conclude that Life Care did not waive its right to object to these damages.

■ We also reject East Hampden's argument that if the jury awarded the low range estimate of damages, the damages awarded were not duplicative of the Medicaid damages. That argument is also without support in the record.

East Hampden's expert did not testify that, in the event the jury awarded the low range estimate of damages, it would have been appropriate for it also to award damages for Life Care's alleged failure to recommend Medicaid certification. East Hampden's expert stated that the medium range

estimates represented East Hampden's actual damages. The low and high range estimates were merely posited to show the jury the effect of varying the number of projected patients at Cherry Creek Nursing for future years.

Because there is no support in the record for the jury's award of damages on both claims, the award of damages for the Medicaid counterclaim must be reversed. Because we are unable to determine what portion, if any, of the jury's award of $2 million on East Hampden's counterclaims for breach of contract is for Medicare reimbursement, we must remand for a new trial on that issue.

### C.

■ Life Care contends that the awards for compensatory damages are improper because they include damages for the period after East Hampden terminated the management agreement with Life Care. We disagree.

Life Care argues that, under Restatement (Second) of Agency § 396(a) (1958), it was free to compete with Cherry Creek Nursing after April 8, 1991, the date East Hampden terminated the management agreement, and thus, no damages should have been awarded for the period following termination. Alternatively, Life Care argues that East Hampden, at most, should be allowed to recover damages through March 9, 1993, at which point Life Care had the sole option to terminate the management agreement. We find no merit in either argument.

Restatement (Second) of Agency § 396(a) (1958) provides that:

Unless otherwise agreed, after the termination of the agency, the agent:

(a) has no duty not to compete with the principal....

This rule finds support in Restatement (Second) of Agency § 393 comment e (1958) which provides that after the agency relationship has been terminated, "the agent can properly compete with his principal as to matters for which he has been employed."

Although these Restatement provisions set out the general rule, when, as here, it is the

agent's breach of fiduciary duties that was the cause for the termination, the agent should not be able to benefit from the termination by being able to compete immediately with the principal. *See* W. Sell, *Agency* § 138 at 124–125 (1975); 3 C.J.S. Agency § 287 at 73 (1973) (an agent is not "permitted to terminate an agency in bad faith in order to take advantage of his principal's condition or to profit by information resulting from his agency."). Hence, the award of damages for the period after April 8, 1991, was proper.

We also reject Life Care's contention that East Hampden's damages should be limited to the period through March 9, 1993, at which time the management agreement would have expired unless Life Care had exercised its sole option to renew for an additional five-year period. If we accepted Life Care's argument, a party could act with impunity at the end of a contract term knowing that its actions would be without consequence. The inequity of Life Care's argument is further illuminated by the fact it sought damages for East Hampden's breach of contract for the entire five-year renewal term. While we acknowledge that Life Care had the sole option to renew the agreement and East Hampden could only terminate the agreement for cause, Life Care cannot have it both ways.

Therefore, we agree with the trial court's conclusion that East Hampden was entitled to damages for the same period that Life Care itself sought damages.

### D.

Life Care further contends that East Hampden was improperly allowed to seek recovery of the management fees that it would have earned because of its management of the competing facilities. Life Care did not raise this issue in the trial court, nor did it object to the jury being instructed that, in determining damages, it could consider not only any economic loss of East Hampden but "anything of value or any profit Life Care or American Lifestyles received as a result of Life Care's breach of fiduciary duty."

Having failed to protest, Life Care has waived any objection to the jury being so instructed and, because the jury's award of $6 million was less than what East Hampden sought for its economic losses, it is permissible to infer that the jury did not award East Hampden any of Life Care's management fees.

### V.

Life Care further asserts that the exemplary damages award should be reversed because it is not supported by sufficient evidence that Life Care's actions were malicious or willful and wanton beyond a reasonable doubt and are improper under Colorado law and the Due Process Clause of the United States Constitution. We reject both arguments.

### A.

An award of exemplary damages is controlled by statute. The relevant statute provides that exemplary damages are proper only if the evidence shows that the actions that caused the injury are "attended by circumstances of fraud, malice, or willful and wanton conduct." Section 13–21–102(1)(a), C.R.S. (1987 Repl.Vol. 6A). The amount of exemplary damages must be reasonable and cannot exceed an amount which is equal to compensatory damages, § 13–21–102(1)(a), and are to be awarded only if they are proved beyond a reasonable doubt. Section 13–25–127(2), C.R.S. (1987 Repl.Vol. 6A).

In reviewing an award of exemplary damages, we must determine "whether there was sufficient evidence, when viewed in its totality and in the light most supportive of the verdict, to support the jury's finding...." *Frick v. Abell*, 198 Colo. 508, 511, 602 P.2d 852, 854 (1979).

Here, when viewed in a light most supportive of the verdict, there was ample evidence to support the jury's award of exemplary damages. In particular, there was evidence that Life Care was actively seeking to recruit patients at Cherry Creek Nursing for the assisted-living program at CCRV. The marketing director of CCRV prepared a memorandum in which she stated: "I found at least 35 very good prospects for our retire-

ment community on the second floor of [Cherry Creek Nursing]."

Furthermore, after CCRV opened, Life Care proposed that East Hampden convert the assisted-living unit to a skilled nursing unit. Life Care made this proposal even though its regional vice president testified that he was opposed to the idea. In addition, Preston, in a letter to the general partner of Cherry Creek Nursing shortly after CCRV opened, reiterated this plan, stating that:

> The time has now come to do the conversion and to place many of the people who would rather be in the retirement center setting next door at the new Cherry Creek Retirement Village. As you are aware, I have a personal interest in the retirement center; however, I feel like it is quite unfair to the partnership owning Cherry Creek Nursing Center to not divulge that many of the residents in the assisted living unit wish to be moved or have already moved because families feel that the retirement center environment is more of their choosing.

He also stated, in a blind copy of this letter to the president of Life Care, that:

> The financial impact on the nursing center could be considerable unless this is properly handled with the renovation and modification of the assisted living units.

The evidence also showed that the opening of Garden Terrace adversely impacted the number of Alzheimer patients at Cherry Creek Nursing. Several witnesses testified that Garden Terrace competed with Cherry Creek Nursing for patients. Garden Terrace hired the marketing director for Cherry Creek Nursing as its marketing director. In addition, there was evidence that approximately 50% of Cherry Creek Nursing's Alzheimer patients moved to Garden Terrace. As a result of the decline in patients, Cherry Creek Nursing closed one of its Alzheimer units. We conclude that this evidence is sufficient to support an award of exemplary damages under the statutory standard. *See Palmer v. A.H. Robins Co.,* 684 P.2d 187 (Colo.1984).

**B.**

We also reject Life Care's contention that the award of exemplary damages violates the Due Process Clause of the United States Constitution. Life Care argues that the exemplary damages, which it states are in excess of 10% of its net worth, constitute a disproportionately large percentage of its net worth. We conclude that the award here, which was limited to an amount equal to the compensatory damages awarded on East Hampden's breach of fiduciary duties claim, does not violate the Due Process Clause of the United States Constitution. *See Pacific Mutual Life Insurance Co. v. Haslip,* 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991); *Palmer v. A.H. Robins Co., supra.*

**VI.**

Lastly, Life Care asserts that the trial court misconstrued § 5–12–102, C.R.S. (1992 Repl.Vol. 2), and erred in awarding East Hampden $2.1 million in prejudgment interest on the damages awards. We agree.

In *Shannon v. Colorado School of Mines,* 847 P.2d 210, 213 (Colo.App.1992) a division of this court stated: "Section 5–12–101 specifically awards interest on money which is due and owing *prior* to the date of payment or *prior* to the date of judgment." (emphasis added) The court then concluded that: "Thus, under § 5–12–101, interest may not be awarded on lost *future* wages and benefits because they are not due and owing prior to the entry of judgment." *Shannon v. Colorado School of Mines, supra* at 213 (emphasis in original). That holding is dispositive of the issue here.

Here, the trial court awarded prejudgment interest on past and future damages. Therefore, we conclude the trial court's award of prejudgment interest must be reversed and an award of prejudgment interest entered on only those damages incurred prior to the entry of judgment.

That part of the judgment awarding $2 million on East Hampden's counterclaims for breach of contract is reversed, and the cause is remanded for new trial on that claim. That part of the judgment awarding prejudg-

ment interest is reversed, and the cause is remanded for an award of interest consistent with this opinion. The remainder of the judgment is affirmed.

STERNBERG, C.J., and HUME, J., concur.