**Laurie FITZGERALD and Aaron Hazard, Plaintiffs–Appellees,**

v.

**The MOUNTAIN STATES TELEPHONE AND TELEGRAPH COMPANY, d/b/a U.S. West Communications, Inc., Defendant–Appellant.**

No. 93–1142.

United States Court of Appeals, Tenth Circuit.

Jan. 31, 1995.

Kathryn E. Miller, Miller & Steiert, Littleton, CO (Doris B. Truhlar and Robert J. Truhlar, Truhlar & Truhlar, with her on the brief), for plaintiffs-appellees.

Jerry R. Atencio, Denver, CO, for defendant-appellant.

Before KELLY and SETH, Circuit Judges, and OWEN,* District Judge.

OWEN, District Judge.

Defendant–Appellant, The Mountain States Telephone & Telegraph Company, d/b/a U.S. West Communications, Inc., (hereafter "U.S. West") appeals from an order of the United States District Court for the District of Colorado denying its motion to set aside the damage portion of a jury verdict in favor of Plaintiff–Appellees Laurie Fitzgerald and Aaron Hazard based upon a finding of violations of their civil rights under 42 U.S.C. § 1981 by reason of their races and color, and related adverse rulings.

For some time prior to 1988, U.S. West had diversity training for its employees. The purpose of this training, sometimes called a

---

* The Honorable Richard Owen, Senior District Judge of the United States District Court for the Southern District of New York, sitting by designation.

"pluralism course", is to enable its employees to have a better understanding of, and thus be better able to work together with fellow employees and customers of the enterprise who are of different genders, backgrounds, races and color. In 1988, U.S. West decided to develop new training materials and a new format for its diversity training. This new format would use outsiders with experience in the field to engage in such training with its employees in a workshop structure. To this end, U.S. West set up pilot projects so that prospects could be observed in action and their suitability determined. These were "Train the Trainer" workshops in which U.S. West's own internal diversity management personnel would work as facilitators with the applicants over some five days of intensive interaction and thereafter determine the suitability of each outside consultant to be a facilitator in guiding future diversity workshops.

These workshops turned control of the interactive process over to the participants rather than it being in lecture form. Thus, each applicant in small and large groups was to recount a personal experience, usually in areas of racial relationships, revealing why the applicant was committed to doing diversity training. Other sessions, called "modules", were also scheduled involving power relationships, homosexuality, and similar matters. Thereafter, these experiences were to be discussed to endeavor to achieve understanding and awareness of the well-springs of thoughts and conduct of those diverse to themselves and thus attain a better ability to have harmonious relationships with all others. These sessions could and often did lead to many highly emotionally charged moments, some quite disturbing. Experienced participants and facilitators such as plaintiff Aaron Hazard come to these sessions expecting to have to deal with this volatility. Hazard testified:

1. As to "The Consultancy", Fitzgerald stated: "The work that I do is helping organizations to take apart the barriers that interfere with their ability to be competitive. And at the core of those barriers, the very fundamental barrier are the differences between people. And those differences—there are many, many differences.

Q. Would it be appropriate to hurl racial epithets at somebody in a diversity workshop in the hope that they get angry enough that they'd reach out and slap you?
A. As a matter of fact, there is a lot of training that is done like that in diversity.

The first "Train the Trainer" workshop took place in April 1989 and the second, from which this action arose, took place in May. The three U.S. West members serving as facilitators for the May workshop included two outsiders engaged as independent contractors by U.S. West, psychologist Dr. Tom Gordon, a black man from Philadelphia, and Marilyn Loden, a white woman from San Francisco, both of whom had considerable experience in the diversity field. They had designed some of the training materials to be used. The third facilitator was a U.S. West employee, Debra Sapp, a black woman, who was a training instructor for leadership development programs in its Office of Management Training and had been a facilitator at some thirty shorter pluralism training sessions.

Twenty-five outside applicants including plaintiffs Laurie Fitzgerald and Aaron Hazard were invited. Fitzgerald, a white woman with many years background in diversity training, was at the time self-employed in this field. She operated out of her Denver, Colorado home doing business under the name, "The Consultancy".[1] She had received U.S. West's letter requesting a submission of qualifications for a multi-racial, both-gender team of facilitators for a U.S. West diversity training program entitled "Leading a Diverse Workforce". Fitzgerald, having done this work for large and small corporations, cities, and federal agencies, called Aaron Hazard, a black man residing in Seattle, Washington, whom she knew to be experienced in this field, having worked with him before under a similar proposal at a Seattle public utility. Hazard was at that time a full-time employee with the Digital Equipment Corporation as

There is a multiplicity of ways that people differ from each other, ranging from the more obvious, such as race and gender, to the more subtle, such as values or belief systems or politics or experiences we have when we grow up. And all of those are brought together in the organization."

an employee relations consultant. He had an extensive background in the diversity field including training employees in government agencies. Hazard was interested in being a "team" with Fitzgerald again, and accordingly, Fitzgerald sent a letter on her "The Consultancy" stationery dated February 14, 1989 to Ann Welter, Pluralism Issues Education Manager, U.S. West, enclosing a work plan for herself and Hazard, whom she described in the letter as her "partner". Fitzgerald proposed a daily rate for each of $1,250 plus expenses should she and Hazard be accepted as diversity training facilitators at U.S. West. Welter thereafter invited her and Hazard to attend a "Train the Trainer" workshop. Welter's letter stated, among other things:

> Following successful completion of the five-day training session, the number of workshops you will deliver and your fee will be negotiated. At that time, a contract will be signed. We expect that each consultant group will deliver around (six) three-day workshops per year. (This number may vary.) The training will begin in May and will continue for approximately three years.

While Hazard never saw this letter, Fitzgerald notified him they had been accepted to attend the workshop, and contacted Welter who scheduled them for the second "Train the Trainer" session from May 1 to 5 at the U.S. West training center in Lakewood, Colorado. The fee to be paid to each for the workshop was $200 a day plus expenses.

On Sunday, April 30, the evening before the training session began, Fitzgerald and Hazard had dinner with Debra Sapp in Lakewood. The plaintiffs and Sapp were joined by several other external consultants also participating in the week's session, and the conversation was by all accounts pleasant.

On Monday morning, the first day of the session, two of the facilitators, Sapp and Loden, introduced themselves to the quite diverse group of twenty-five external consultants being considered and Sapp, among oth-

er things, stated that she would be making the final decisions about hiring.[2]

After the preliminaries that day, all the external consultants were asked to participate in a group session, where, sitting in a circle, each would recite a personal life experience which contributed to their commitment to diversity training. Many were very emotional.[3] Plaintiff Hazard testified that he related the following event:

> [In] 1968, my brother, my brother-in-law, and myself were arrested for allegedly disturbing the peace and being drunk. And in that situation, seven white police officers beat us very savagely and severely. One police officer broke a night stick over my brother-in-law. * * * And we were found not guilty of being drunk and disturbing the peace, and I just—I felt that we were so badly injured that we filed a civil suit against seven of the police officers in Federal Court. And we were successful in winning the case.
>
> And I was talking about how I hated police, specifically—well, they were all white police—I hated white police officers, and I talked about how it took a long time for me to get over hating white police.

Plaintiff Fitzgerald, as she testified, related in her turn:

> I shared a story with the group about being involved in a love affair with a black man in the Denver community. And he and I were next door neighbors. That's how we met. And we had been together for about seven years at that time; and he was the father of a little boy who was the same age as my son, and the boys were best friends. And together, the five of us had created a family. We owned a vacation home together. We owned—did some business together. We did lots of things as a family. We traveled together, and that relationship was ending. And it had been ending for some time, and it was very painful to talk about.
>
> And I shared with the group that our relationship, particularly since we had an-

---

**2.** In this case, co-facilitators Gordon and Loden were to give Sapp input, but Welter testified that Sapp had the "final say".

**3.** The first one to speak was a gay man who "talked about his fear of going on the street and about gay bashing...."

nounced plans to marry in 1985, had been under the pressure of the black community of Denver. * * * To illustrate the pressure that we were getting, I told a couple of stories, one about being blockaded in a toilet stall in a hotel at a function we had attended by a group of black women. I told abut flirtatious behavior of some black women toward my significant other, my partner, my friend, in public gatherings. I told about a woman who came to my friend's home and told him that she was so upset about our plans to marry and about him betraying the black community that she was suicidal about that, and I told them about him caving in and starting to distance himself from me and the effect on his business of this pressure.

Following this recital, which was quite emotional,[4] Fitzgerald testified:

Aaron [Hazard] was very familiar with the breakup of our relationship, and he came across the room and brought me his handkerchief; and he bent over and he embraced me to give me support. * * * I looked over Aaron's shoulder as he was hugging me, I saw Debra Sapp. And she was leaning back in her chair and her arms were crossed tight across her chest, and she was glaring at me with anger, with hate. It was immediately signalled to me, and my stomach sunk.[5]

Thereafter, Fitzgerald continued:

... somebody asked me if I thought I'd have trouble working with women of color, since I was so angry at black women.... I said I wasn't saying I was angry at black women. I was saying that I angry at some black women but in particular at the

pressure that we felt and how that hurt us.[6]

The following day in the workshop, Fitzgerald testified:

We were told to pair up with someone, and one of us would hold our fist closed. The other one was given a period of time, 20, 30, 40 seconds, to open that fist. And the instructions were use whatever means necessary to accomplish the objective of opening the fist. * * * [Jim Porter, with whom Ms. Fitzgerald was paired,] pressed something in my arm, and immediately my fist came open because it hurt. It was pain in my arm. And he told me later— and I think he shared with the group—the name of a tendon that he said was something like a funny bone that got that reaction. * * * I said [to the group] that I practically had to offer Jim my body in order to get him to open [his] hand and even that didn't work.

Following this, Judy Swinnerton, one of Fitzgerald's fellow applicants for employment, became hostile toward her and as Fitzgerald testified:

turned to me and [Swinnerton] said, "I resent that—you were being sexist in that exercise; and I resent it." * * * [The next day] I told Judy Swinnerton that the—I described her behavior in the spirit of feedback. I told her that the day before when she had said, "You are being sexist," [7] that the effect on me was for me to shut down in terms of listening to what it was she wanted from me. I couldn't listen to it because the label was there, and I was defending myself against that label. * * * I was sitting right next to Ms. Sapp. She was turned slightly away from me, and she

4. Others of these sessions were equally emotional, Fitzgerald testifying:
... we had a module on homosexuality, and the issue of AIDS came up. And there was a lot of crying and people talking about their experiences losing friends and loved ones to AIDS or people in the group who had—were HIV positive. And Aaron [Hazard] kind of did what I was hoping he was doing for a long— going to do for a long time, and that was he cut loose with his emotions.

5. Fitzgerald testified that one of her fellow participants told her "that I was committing genocide in my relationship with this black man."

6. Hazard recalled his partner Fitzgerald saying that "she hated the black women who tried to break up her relationship." This stronger version of Fitzgerald's recitation would make Sapp's reaction more understandable, although still not acceptable from a facilitator in a diversity training session.

7. According to Fitzgerald, another woman participant, Vera Mendosa, was of the same mind as Swinnerton.

had her arms crossed on her chest ... And finally [Sapp] said [to me], "Please, she's trying to give you feedback. Why don't you just listen to the feedback?" * * * I said, "But Debra—" And as I said, "But Debra," I put my hand on her arm because she was turned away from me. She recoiled—she turned around and looked at me, pulled her arm away and said, "Don't you touch me." * * * The room went deadly silent ... I was awestruck.

A clinical psychologist, Dr. Arthur Jones, engaged as an expert witness by plaintiffs Fitzgerald and Hazard gave the jury an explanation for Debra Sapp's conduct in his report as follows:

[H]ostility by black women toward white women married to black men ... is a problem experienced by virtually all black male-white female inter-racial couples.... The psychological dynamic underlying the phenomenon[8] is as follows: African American women have historically been victimized by dual societal processes of racism and sexism. Moreover, white women have been held up in American society as models for feminine beauty and sexual attractiveness for men, while African American women ... are rarely portrayed in movies, advertisements or magazines as physically attractive ... When African American men find themselves attracted to white women, it is therefore natural for African American women to view these men as victims of a societal process that takes these men away from potential African American female partners....

All of this is compounded by the fact that single African American women outnumber single African American men (particularly in circles of people with high levels of education ...) These women therefore feel trapped in a situation where there are no men available to them, in large part (in their perception) because white women are "stealing" the few potentially available partners ...

Dr. Jones testified furthering the foregoing that this has

become a kind of collective experience, and it's very, understandable, in a way, with the sisterhood of black women who are angry about the behavior of some of the black men in the community, and by extension, the white women that they associate themselves with.

On Thursday morning, Sapp told Fitzgerald that, although she had no complaints about Fitzgerald's performance as a facilitator, she had a concern about Fitzgerald's ability to work with U.S. West employees. When pressed by Fitzgerald as to the substance of these concerns, Fitzgerald testified that Sapp said, "You white bitches are always taking up the air time, and I'm sick of it." [9]

On Friday, May 5, the last day of the workshop, Sapp prepared a handwritten summary in which she listed each participant other than Fitzgerald in a category of "ready" or "not ready". Sapp placed Fitzgerald in a separate category entitled "services not needed". Fitzgerald testified she was told by Sapp, "We have decided we are not going to use you," [10] and when Fitzgerald asked why, Sapp said, "[Y]ou blew it on the first day."

Sapp separately told Hazard that Fitzgerald had not passed the program, but asked him whether he was still available to work himself. Hazard testified he was, and that Sapp then said:

For a while, we didn't think you were going to make it; but you seem like a nice, sharp, intelligent brother, and you've passed. And if you divorce yourself from Laurie Fitzgerald, you can have all the business you want at U.S. West; and I will

---

8. Plaintiff Hazard confirmed the frequency of this "phenomenon" in his personal experience, testifying:

It was hostility and anger that I have seen emanating from black women when they see black men with white women or are aware of a white woman who is dating a black man.

9. Sapp, at all times, denied making this statement. Welter's recollection of Sapp's version of the conversation was more moderate. It is quoted at fn. 26 *infra*.

10. Gordon and Loden, the other two U.S. West facilitators, concurred in Sapp's decision.

help you get other business in the Denver area, where I'm well connected.

Four days later, May 9, Fitzgerald wrote a letter of complaint to Larry Waller, who had been but was no longer Director of U.S. West's Office of Pluralism, Ann Welter having taken over the office. Fitzgerald was not aware of this change or that Waller was on sick leave. She addressed the letter to Waller at U.S. West's Office in Lakewood, Colorado, not being aware that Waller's office was in Omaha, Nebraska and that his name was not in the Lakewood office directory. The tone of her letter was rather moderate.[11] She complained of two things: (1) that Sapp had broken the confidentiality agreement that had been made at the beginning of the session by discussing her with others, and that this had resulted in polarization of the group along racial lines and, (2) that Sapp had stereotyped her because Sapp had a "personal issue" she had not yet worked through. Fitzgerald accordingly asked for a chance to be evaluated by someone else at U.S. West "who is not working personal issues and can therefore see me and my abilities through fewer filters."

Four weeks having passed and Fitzgerald not receiving a reply to her letter to Waller, she wrote a second letter this time to U.S. West's Chief Executive Officer, Jack McAllister, enclosing a copy of the letter to Waller. These letters were promptly sent by FAX to Jan Fincher, then the Director of Management Training and Course Development at U.S. West. Fincher had been with the company for twenty-five years, and had herself been a former facilitator in diversity training. She recognized the urgency of responding, and met with Ann Welter, Sapp's superior, and then had a lengthy meeting with Sapp. At the meeting, she had Sapp tell her in detail what had happened at the workshop, which Sapp did on a day-to-day basis. Sapp followed this up with a written report. Fincher had Welter and Sapp speak with Gordon and Loden, the other two facilitators, which they did and reported back to her. Fincher was informed that Gordon and Loden had agreed with Sapp not to engage Fitzgerald[12] and to engage Hazard. She also received written reports from certain other participants in the workshop, including one specifically favorable to Sapp written by Swinnerton. Accordingly, some ten days after getting Fitzgerald's mailing to McAllister, Fincher prepared and had sent to Fitzgerald a letter dated June 21, over the signature of Richard Remington, U.S. West's Vice President of Human Resources, detailing the nature of the investigation and observing that the other facilitators had agreed with Sapp's judgments and concluded:

> Our decision to select other individuals over you—for this particular workshop—was made on the basis of demonstrated performance, components of which were discussed with you and the other participants at the beginning of the week.

> Also as a result of our investigation, I have seen no evidence to support your allegations of racial or gender-based discrimination. Indeed, we are proud of the pluralistic mix represented on our facilitation staff.

> I regret that your experience was less than satisfactory. I am in agreement with our initial position that your particular skills and facilitations style, and our expectations regarding the facilitation of this particular workshop, are not compatible.

Thereafter, Fitzgerald wrote two more letters in substance stating that U.S. West's initial response had not satisfied her and accordingly, Fincher, concluding that a lawsuit was probable, turned over the matter to U.S. West's law department. Further, inasmuch as Fitzgerald's initial letter had described Hazard as her "partner", she determined not to make a job offer to Hazard

---

**11.** In her letter she quoted Sapp as using the term "white *women*," whereas in her testimony she said Sapp had actually used the term "white *bitches*".

**12.** Gordon, in his deposition supported this, stating:

> I had heard from other participants by the time of our faculty meeting that they, too, these participants were also upset with Laurie Fitzgerald.

under circumstances where it appeared Hazard's partner was going to sue U.S. West.[13]

Thereafter, this action was instituted against U.S. West as the sole defendant. Sapp was not named as a party. A six-day trial commenced September 14, 1992. At its conclusion, the jury found in favor of the plaintiffs against U.S. West on the issue of discrimination and awarded Fitzgerald $1,285,000 in total damages. The jury broke this down as follows: $535,000 for economic damages, $250,000 for emotional damages and $500,000 in punitive damages. The jury awarded Hazard a total of $1,060,000 in damages: $310,000 for economic damage, $250,000, in emotional damages and $500,000 in punitive damages.

U.S. West filed a post-verdict motion seeking, among other things, a new trial on the issue of damages or in the alternative a remittitur on the ground that the verdict was so grossly excessive as to have been the result of passion and prejudice. The district court denied the motion. Defendant also at appropriate times requested 1) that the district court dismiss the punitive damage claim on the ground that there was no evidence to support it as to U.S. West, and 2) that the district court charge the jury that the measure of economic damage is net profit not gross profit. The district court denied these requests, and defendant appeals from these adverse rulings as well.

 Our review of the denial of a motion to set aside a jury verdict claimed to be grossly excessive and order a new trial requires us to apply the well-established abuse of discretion standard. *Brown v. Richard H. Wacholz, Inc.*, 467 F.2d 18 (10th Cir.1972).

We review *de novo* as a matter of law the district court's rulings permitting the jury to consider punitive damages, and declining to instruct the jury as to net profits being the standard in determining economic damages. *United States v. Laughlin*, 26 F.3d 1523, 1528 (10th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 428, 130 L.Ed.2d 342 (1994).

U.S. West does not appeal from the jury's conclusion finding it liable to each plaintiff under the doctrine of respondeat superior for such compensatory and emotional damage as flowed from employee Sapp's conduct discriminating against each by reason of race and color. *Phelps v. Wichita Eagle–Beacon*, 886 F.2d 1262, 1269 (10th Cir.1989). However, it vigorously challenges the size of the compensatory damage and emotional damage awards as to each plaintiff, contending that they were so grossly excessive as to have necessarily resulted from passion or prejudice.[14]

In assessing the claim of excessiveness here, we must view these awards in their setting and keep in mind that this developing area of diversity training has, at its motivating core, highly emotional areas of interpersonal relationships with real and potentially volatile strong conflicts, and its purpose is to cause those involved to recognize and deal appropriately with such as they find within themselves and others. Thus, such workshops, by their very structure, are intended to cause the participants to lay bare the most bitter, bigoted, offensive, and often savage interpersonal confrontations and feelings that can arise, with the participants, after self and group assessment, being enabled to achieve

---

**13.** Hazard testified he would not have taken the job anyway because:

> I felt insulted that somebody, a company representative, would ask me to compromise my principles to get business.... I was being told who I can associate with and who I can't. In other words, I felt I was losing my freedom; and I felt I was being discriminated against.

**14.** While contending there was no evidence permitting the jury to even consider punitive damages as to it, U.S. West maintains that even the very size of the punitive damage awards totaling $1,000,000 is further support for its contention that the entire damages award was the result of

passion and prejudice. *In Malandris v. Merrill, Lynch, Pierce, Fenner & Smith*, 703 F.2d 1152, (10th Cir.1981), *cert. denied*, 464 U.S. 824, 104 S.Ct. 92, 78 L.Ed.2d 99 (1983), we said that:

> absent an award so excessive as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption or other improper cause invaded the trial, the jury's determination of the damages is considered inviolate. Such bias, prejudice or passion can be inferred from excessiveness. However, a verdict will not be set aside on this basis unless it is so plainly excessive as to suggest that it was the product of such passion or prejudice on the part of the jury.

as much interpersonal harmony and understanding as is possible with all others regardless of race, color or background. The participants come expecting this and the possibility of bruised feelings to themselves and others. Here, unfortunately, the very workshop format which was designed and intended to expose strong, unacceptable emotions and responses so that they could be examined and controlled, in Sapp's case engendered an emotional response that while not uncommon, was one that Sapp herself was unable to deal with.[15]

Against this background, turning to the issue of compensatory damages to plaintiffs Fitzgerald and Hazard, the jury awarded Fitzgerald $535,000 and Hazard $310,000.

■ Turning first to Fitzgerald, we conclude that the compensatory award of $535,000 was grossly excessive, being based upon her testimony that she "intended and would—was willing to make myself available to do approximately one and a half [workshops] a month ...". But her willingness had no relationship to U.S. West's offer and was sheer wishful speculation on her part, and therefore on the jury's part. The letter of invitation U.S. West initially sent to Fitzgerald p. 1037, *supra,* observed that U.S. West expected each "consultant group" would deliver "around (six) three-day workshops per year." While this figure was realistically not the firmest, due to the problems of scheduling and the total number of groups and individuals that U.S. West would ultimately involve in the project, even using this number of workshops,[16] the gross income figure for each plaintiff, assuming U.S. West had paid each at the higher rate of $1,500 a day, an increase over Fitzgerald's proposed

rate of $1,250 a person per day, would have meant that the total payment to each would have been $81,000 for the entire contract.

Damages may not be awarded on the basis of what Fitzgerald testified she could have performed, but only on what the jury could reasonably have determined was there for her to do. *Republic Nat'l. Life Ins. Co. v. Red Lion Homes, Inc.,* 704 F.2d 484, 489 (10th Cir.1983); *Western Cities Broadcasting, Inc. v. Schueller,* 849 P.2d 44, 50 (Colo. 1993). As to this, the Welter invitation containing the six-a-year proposal was the only evidence on which the jury could reasonably have based any conclusion.[17]

It also appears that the jury may have awarded her lost income from an FBI diversity training contract for which she (and a number of others) applied some six months after the U.S. West workshop, which she failed to secure. She was the sole witness to this lost opportunity. Her application to the FBI was in its opening phase with Fitzgerald promoting her pilot program to the FBI when one of the interviewers became caustic and, according to Fitzgerald's testimony, said:

> We began the pilot. One of the people—I was presenting some concepts of diversity and differences and some of the different kinds of things that we were going to need to address; and one of the participants in the pilot began to attack the concepts. He was saying, "I disagree with those, that's a bunch of crap, I don't want to hear that, I don't know why I'm here." And he was kind of yelling, raising his voice at me.

> And as I sat there listening to him, all of a sudden, it was like a flashback to the May

*Id.* at 1168.

**15.** Fitzgerald saw this clearly in her letter to U.S. West four days after the incident, stating that Sapp saw her through "filters", and had "personal issues." See *supra,* p. 1040.

**16.** There was evidence in the record that—from hindsight—some of the successful applicants had more sessions and some of them less than the six a year, but to reach an award on this record beyond what U.S. West had stated in its letter of invitation was the proposed number of sessions, meant that the jury was involved in sheer speculation. Indeed, it appears that if Fitzgerald and

Hazard had done the number of workshops for which the jury awarded them damages for lost income, those two alone would have performed close to half of the total workshops that U.S. West sponsored even though there were 22 *other* outside facilitators U.S. West did use following these "Train the Trainer" workshops.

**17.** The hindsight work experiences of others, some working more than six-a-year, some less, also would have required the jury, without any evidence as to the quality of performance of any others, to speculate as to where Fitzgerald and Hazard would have ended up in the mix.

workshop, where people[18] and other people were joining in, were attacking me. And I broke down. I couldn't go on. I had to leave the session.

Q. Did you lose the FBI contract?

A. Yes. They told us at the end of the day. The behavior was—they couldn't deal with that.

There was no evidence, however, that the FBI would have approved her pilot program and thereafter given her a contract even if she had completed her presentation without incident. Here too, we conclude that the jury, in apparently awarding her the loss of this contract, was engaged in complete speculation in several directions.

In this connection, we note that Fitzgerald had had two successful FBI workshops between the U.S. West workshop and the FBI turn-down six months later described above, for which she and her partner (not Hazard) were paid $6,600. We also note that Fitzgerald sought 73 diversity contracts and received 14 in the years following the U.S. West May, 1989 workshop without making any claim of loss attributable to U.S. West for those she did not secure other than the said FBI contract six months later.

Accordingly, the most the jury should have been permitted to consider as Fitzgerald's economic damages was the said $81,000, and thus the verdict that was rendered was grossly excessive.

■ As to the jury's award to Hazard of economic loss in the amount $310,000, while Hazard had not seen U.S. West's letter to the "Consultancy" speaking of six workshops a year, any lost earnings claim in excess of that was obviously sheer speculation based upon Hazard's conjecture in his testimony that he "would be available at least three weeks per month to do a workshop." In addition, the jury's award to Hazard was made even more speculative by the fact that 1) at the time he attended the U.S. West

workshop, in May 1989, he had applied for full-time employment at Boeing which he was offered and accepted two or three weeks later in May 1989, having negotiated his starting compensation up to $55,000 a year plus bonuses and fringe benefits, and 2) he acknowledged that by the time of the trial, the Boeing job was so time consuming that "it would be difficult for [me] to get away for blocks of time; a week at time." This would have foreclosed any substantial independent consultancy work,[19] and on this record puts even an $81,000 compensatory income loss maximum (spread over several years) into serious question, unless the jury also concluded he would have turned down or quit the Boeing job.

■ U.S. West also appeals the district court's declining to instruct the jury to deduct whatever expenses it found would have been associated with the production of income had a plaintiff received the U.S. West contract. To resolve this question, we look to Colorado law, see *Western Battery Co. v. Standard Elec. Co.*, 522 F.2d 986, 989 (10th Cir.1975), and conclude that the district judge was in error in declining to give the net profit instruction requested by the defendant. It is well-settled Colorado law that "[d]amages sustained by a business must relate to loss of net profits." *Lee v. Durango Music*, 144 Colo. 270, 355 P.2d 1083, 1087 (1960); see *Graphic Directions v. Bush*, 862 P.2d 1020, 1024 (Colo.Ct.App.1993) ("Damages for lost profits are measured by the loss of net profits, meaning net earnings or the excess of returns over expenditures, but not lost gross profits or gross sales revenues.").[20] Hazard acknowledged that if he had gone into the diversity consulting business, he would have had expenses, and there was also substantial documentary evidence that Fitzgerald's business, "The Consultancy", under whose aegis she applied to U.S. West for employment, had expenses in each of the years that income was being earned. Thus,

---

**18.** This, in part, must have had reference to non-U.S. West employees, such as Swinnerton, who caused Fitzgerald, as she testified, to "shut down in terms of listening ..." (See p. 1038, *supra*).

**19.** Hazard, in fact, had no consulting work at this time.

**20.** *Waters v. Wisconsin Steel Works*, 502 F.2d 1309, 1321 (7th Cir.1974), *cert. denied*, 425 U.S. 997, 96 S.Ct. 2214, 48 L.Ed.2d 823 (1976), cited by appellees, does not speak to the contrary.

on the record here, there was evidence which created fact issues regarding expenses for the jury to decide. The district judge recognized that such issues existed by permitting U.S. West to argue the issue of expenses, but this, we conclude, was insufficient since the jury should have been told that if in its determination of lost income it also determined that unreimbursed expenses would have been incurred, the law required it to reduce any award accordingly.

Accordingly, we conclude that the awards of compensatory damage to the plaintiffs from the loss of prospective employment with U.S. West were so grossly excessive and so tainted by speculation as to have the strongest appearance of being the result of passion and prejudice and therefore cannot stand. A retrial is necessary, consistent with the foregoing. On any such trial, the jury is to be instructed to deduct what it concludes would have been unreimbursed expenses in reaching any award.

■ Turning to the awards to each of the plaintiffs of $250,000 for emotional damages, we conclude that while some award was proper on this record, the awards reached were clearly excessive considering the evidence viewed in the best light on behalf of the plaintiffs, experienced diversity training facilitators.

Fitzgerald testified to great distress upon learning that she would not be considered for employment at U.S. West; that she felt humiliated and that her dignity had been stripped away. She also testified that subsequent to the U.S. West workshop, she felt like a monster, accused of being a racist, a sexist,[21] anti-semitic, homophobic,[22] everything contrary to the person she knew herself to be and it affected her entire life. Fitzgerald testified that her Herpes Simplex I, which is cold sores and fever blisters brought on by stress, which had occurred

theretofore every two to three years, occurred weekly for some eight months after the U.S. West workshop, and she had to get her doctor to "up the power" of her prescription. She also talked a lot with a close friend who is a psychotherapist who was "... a great help ... to put the pieces together and get into some healing and moving on with my life. I'm feeling fairly up beat, but it's still there." She proffered the testimony on the trial of one Dr. Helen Hand, Ph.D., a psychotherapist who utilized, in Hand's terms, "a talking therapy designed at solving problems based on insight." Dr. Hand had been engaged by Fitzgerald and her attorneys to testify at the trial as to her emotional state. She met with Fitzgerald four times. She did not treat Fitzgerald. She testified that Fitzgerald was a "very strong ... self-made woman" for whom this was a crushing experience leaving her feeling "helpless" and "devastated" with significant disturbances and distress having continuing effects. Dr. Hand did recognize that Fitzgerald, at the time of the U.S. West workshop, was involved in a distressing romantic relationship which Dr. Hand stated could "have a very serious effect upon her".

Hazard testified that his treatment at the U.S. West workshop caused him to suffer headaches during and for some weeks after the workshop, which incapacitated him during that period.[23] He testified that to do business with U.S. West he was told to cut his association with Fitzgerald and he therefore felt he was being discriminated against and losing his freedom. This gave him the headaches and he felt humiliated and insulted and became very angry and remained so even to the day he testified on the trial. He, however, offered no evidence of a health care professional as to the extent of his disability, and testified he took a full-time job at Boeing a month after the U.S. West workshop at which he performed successfully, starting at

---

**21.** It was Swinnerton, Fitzgerald's fellow applicant, not Sapp, who engendered this according to Fitzgerald's testimony elsewhere. Hazard confirmed this.

**22.** The only reference to this in the record is that during a module dealing with gays and lesbians in society, one of the gay participants indicated

he thought Hazard was homophobic, and that "there was homophobia in the room."

**23.** Hazard had had headaches before U.S. West's workshop when working for Digital Equipment Corporation which he said resulted from Digital not giving him a promotion due to racial prejudice.

$55,000 a year and receiving raises and bonuses in each year thereafter.

While the impact on each plaintiff was quite different, the jury's finding that the events in this case caused some emotional injury to each of them is supported by the evidence. However, viewing that evidence against such authorities as *Wulf v. City of Wichita*, 883 F.2d 842 (10th Cir.1989), and authorities reviewed therein, *id.* at 874–75, we conclude that an award of $250,000 to each plaintiff in this case was mechanistic and grossly excessive and we remand to the district court for a new trial on this issue.

Finally, we turn to the punitive damage award to each plaintiff in the amount of $500,000 for a total of one million dollars against U.S. West. U.S. West contends that there was no evidence in the record permitting the jury to consider punitive damages against it as Sapp's employer.

■ Federal standards, to the extent they exist, govern the determination of punitive damages under federal civil rights statutes. In *Jackson v. Pool Mortgage*, 868 F.2d 1178, 1181 (10th Cir.1989), we held that to award punitive damages in federal civil rights cases, the discrimination must have been malicious, willful, and in gross disregard of plaintiff's rights. There are, however, no federal standards governing the responsibility of an employer for the acts of an employee, and accordingly "[w]here federal laws are deficient in the provisions necessary to furnish suitable remedies," state law governs. *Mitchell v. Keith*, 752 F.2d 385, 389 (9th Cir.1985), *cert. denied*, 472 U.S. 1028, 105 S.Ct. 3502, 87 L.Ed.2d 633 (1985). The events in this case having occurred in the environs of Denver, Colorado, we look to Colorado law. *Malandris v. Merrill, Lynch, Pierce, Fenner & Smith, supra*, also coming to us from the District of Colorado involving punitive damages, provides guidance. There

we looked in part to the Restatement (Second) of Torts § 909, which reads:

> Punitive damages can properly be awarded against a master or other principal because of an act by an agent if, but only if, (a) the principal or a managerial agent authorized the doing and the manner of the act, or (b) the agent was unfit and the principal or a managerial agent was reckless in employment or retaining him, or (c) the agent was employed in a managerial capacity and was acting in the scope of employment, or (d) the principal or a managerial agent of the principal ratified or approved the act.

703 F.2d at 1175 n. 16; *see also Fitzgerald v. Edelen*, 623 P.2d 418, 423 (Colo.Ct.App.1980) (adopting Restatement (Second) of Agency § 217(c), with language virtually identical to § 909).

■ While we agree with the jury's necessarily underlying conclusion that the conduct of U.S. West's employee Sapp would support a punitive damage award imposed upon *her* for conduct containing elements that could well be viewed as involving malice or willfulness, the same is not true as to her employer U.S. West. Sapp's reaction to Fitzgerald's recitation was clearly not authorized and since Sapp had facilitated a number of shorter diversity training sessions for U.S. West prior to this time without incident, there was no suggestion that U.S. West had any reason to expect that Sapp would react as she did. Nor is there any suggestion that U.S. West ratified or approved her acts as the jury was to find them. On the contrary, on the basis of Fincher's investigation (see, *infra*), U.S. West was reasonable in its conclusion that the incident had not happened as Fitzgerald claimed, and that Sapp was blameless. Looking specifically at Restatement of Torts § 909(c), we conclude as a matter of law that Sapp was not employed in a managerial capacity.[24] The most that could be said as to

---

**24.** The fact that Sapp at the beginning of her trial testimony described herself as a "manager" is not evidence of the type of managerial capacity that the law requires to charge an employer punitively with the conduct of a managerial agent. For such to occur, the managerial agent must be of sufficient stature and authority to have some control and discretion and independent judgment over a certain area of a business

with some power to set policy for the company. *See Egan v. Mutual of Omaha Ins. Co.*, 24 Cal.3d 809, 169 Cal.Rptr. 691, 698, 620 P.2d 141, 148 (1979), *cert. denied*, 445 U.S. 912, 100 S.Ct. 1271, 63 L.Ed.2d 597 (1980), *cited with approval in Mattingly, Inc. v. Beatrice Foods*, 835 F.2d 1547, 1564–65 (10th Cir.1987), *vacated on other grounds*, 852 F.2d 516 (1988). Sapp, a facilitator, was far from having such stature.

Sapp's authority was that she was a non-policy-making facilitator who was empowered to decide who would get a contract from U.S. West to do diversity training. There is no showing she otherwise had the power to hire or fire, promote or demote anyone; and, as noted earlier, to some extent Gordon and Loden had input into the exercise of the power she did have. Thus, no provisions of Colorado law or the Restatement of Torts make U.S. West punitively responsible for Sapp's conduct on the ground of respondeat superior.

Finally, Fitzgerald contends that the punitive damage awards were justified because U.S. West did not adequately investigate or respond to her complaint. While there was a delay of some three or four weeks in U.S. West's superiors becoming aware of the workshop events involving Fitzgerald, she did send her letter of complaint to the wrong city and state, and her second letter, sent four weeks later to U.S. West's Chief Executive Officer containing a copy of her first, even with the sanitized version of Sapp's remark, received immediate attention. Fincher, the manager of the diversity program, had Welter, Sapp's superior, get in touch with the major people involved, Gordon, Loden, and Sapp, and learned that both Gordon, who is black, and Loden, who is white, had voted with Sapp to reject Fitzgerald as a candidate to perform diversity work at U.S. West. She also got written input from other participants in the workshop, one in particular strongly supportive of Sapp. She checked with Edward Aguilar, a U.S. West employee who had done some training sessions with Sapp in the past, as to her conduct, which apparently was unexceptiona-ble. Fincher personally interviewed Sapp who told her in detail the events of the week of the workshop contradicting Fitzgerald,[25] and followed it up with a written report. Thus, on the total input from its investigation, U.S. West had a reasonable basis for concluding that Sapp had not been, as Fitzgerald claimed, "working personal issues", and seeing her through many "filters", which was Fitzgerald's main point in her letter. Only some ten days passed before all this was done and Fitzgerald's letter to McAllister was answered. While perhaps from hindsight Fincher might have done things a little differently here or there, on this record there is nothing in U.S. West's conduct in the Fitzgerald investigation that in any way rises to the level warranting a punitive damage award against it, let alone one of a million dollars.

Punitive damages by their name and nature are designed to punish and deter. There is no question here that the jury had a basis for finding that Sapp reacted unacceptably to Fitzgerald, even keeping in mind the highly emotional climate that is normal in such workshops. Accordingly, while U.S. West is responsible to plaintiffs under the doctrine of respondeat superior for whatever appropriate compensatory and emotional damages were attributable to Sapp's conduct, U.S. West in no way conducted itself so as to permit the jury to conclude that it deserved a financial smart as punishment or a deterrence. Accordingly, it was error for the district court not to grant defendant's motion to dismiss plaintiffs' punitive damage claims at the close of the testimony.

In conclusion, we hold that the damage awards separately and in total in this case

---

**25.** Fincher did not specifically ask Sapp if she said, "You white *women* are always trying to take all the air time and I'm sick of it[,]" (underscoring supplied) which was the way Fitzgerald had phrased it in her letter. Sapp, on the trial, denied she said this either in this form or as Fitzgerald related it in her testimony, and Welter, in the investigation did elicit from Sapp an apparent version of this conversation which was "that she [Sapp] had given Laurie Fitzgerald feedback that Laurie Fitzgerald had consistently taken up too much time in the pluralism workshop." Further, Fincher, given the details of Fitzgerald's letter, did not feel it was necessary to get further input from Fitzgerald before pre-paring U.S. West's response to her claims. Whether in the light of the extensive investigation she did make, she is to be faulted for not contacting Fitzgerald is debatable. In any event, the failure of Fincher to contact Fitzgerald in no way rises to the level of justifying punitive damages against U.S. West for the nature of the investigation, nor was it censurable, as plaintiffs' claim, for having had Welter and Sapp work up the investigation. It was appropriate to *involve* Sapp in the investigation since she was present for the entire week in question in addition to being the target of Fitzgerald's criticism, and the investigation was handled under the personal direction of Welter.

were so grossly excessive as to raise the irresistible inference that they were the product of passion and prejudice on the part of the jury, occasioned by this unusual and highly emotional situation. We reverse and remand for a new trial on the issue of compensatory damages in accordance with the foregoing, and with the direction that on such trial the jury should be charged that it is to offset any expenses it concludes would have been incurred in achieving such income. We reverse and remand for a new trial on the issue of emotional damage. We reverse on the issue of punitive damages and remand with the direction that the punitive damage claims of each plaintiff against U.S. West be dismissed.