**Sarah Hope STEINHOFF, Plaintiff,**

v.

**UPRIVER RESTAURANT JOINT VENTURE, Defendant.**

No. CIV. A. 99–1.

United States District Court, E.D. Kentucky, at Covington.

Oct. 11, 2000.

---

Randolph H. Freking, Freking & Betz, Cincinnati, OH, for Plaintiff.

Rachael A. Rowe, Keating, Muething & Klekamp, Cincinnati, OH, for Defendant.

## OPINION AND ORDER

BERTELSMAN, District Judge.

Plaintiff brings this cause of action alleging sexual harassment and gender discrimination under Title VII of the Civil Rights Act of 1964, as amended, and under Kentucky Revised Statutes Chapter 344. On June 6, 2000, the court granted summary judgment to defendant on all claims except the hostile environment claim.[1]

A jury trial was held in this matter on July 17 through 19, 2000. The jury returned a verdict for the plaintiff in the amount of $25,000 for compensatory damages and $250,000 in punitive damages.

This matter is presently before the court on post-trial motions of both parties. Defendant has filed a motion to amend the judgment (doc. # 57), motion for a stay of proceedings to enforce the judgment (doc. # 58), and a motion for a judgment as a matter of law or, in the alternative, for a new trial or remittitur (doc. # 59).

## FACTUAL BACKGROUND

Plaintiff Sarah Steinhoff ("Steinhoff") began working for defendant Upriver Restaurant Joint Venture d/b/a Hooters–Newport ("Hooters")[2] in August of 1996 as a server. Prior to coming to the Newport Hooters, Steinhoff worked at the Springdale, Ohio, Hooters for several months in 1995.

Hooters has a written policy against sexual harassment. Information about this policy is included in the orientation package waitresses receive when they become employees at Hooters. A copy is prominently posted where employees will see it every day. Steinhoff signed a copy of the policy stating that she had read and understood it. The policy included that reports of sexual harassment could be made confi-

dentially to an "800" number or to a supervisor.

Steinhoff alleges that she was sexually harassed by Tom Bredenberg, a manager, while working at Hooters. She testified at trial that Bredenberg constantly subjected her and other waitresses to a barrage of nonstop sexual comments. Steinhoff specifically stated that "[Bredenberg] didn't seem to be able to talk to the girls ... without some kind of sexual innuendo. He ... always had to be touching ... invading our personal space ...." (Trial Transcript 7/18/00 at p. 34).

The only comments Steinhoff recalled Bredenberg making to her were his asking her to go home or to a hotel with him and his stating that he would like to take her home and tie her up. She testified that these comments were "nonstop and they were very offensive" and made her feel "like a piece of meat, degraded, violated." (Trial Transcript 7/18/00 at pp. 31, 33).

Steinhoff testified that Solomon Makonnen, another manager, also made sexist comments to the employees such as, if he had a wife, she would bow down to him and be subservient to him.

Steinhoff also testified that she understood that she was likely to be exposed to sexual comments from the customers, but that she did not expect it from the managers.

According to her testimony, Steinhoff did not immediately complain about Bredenberg's conduct because she did not think any action would be taken against Bredenberg, and she did not have any faith in the sexual harassment policy of Hooters. The testimony of Deanne LeDonne and Mary Wilcox, two other servers, is in accord. (Id. at pp. 34–35, 49).

Steinhoff, however, finally complained when Bredenberg's conduct "crossed the

---

**1.** Plaintiff originally asserted a claim alleging she was terminated for refusing sexual favors to a manager.

**2.** Defendant is a limited partnership which is a franchisee operating the Newport Hooters. A management company provides common management services to various restaurants in the chain.

line" when, on one occasion, he put his hand in her shorts, pulled out her pantyhose, and looked down into them.

According to Steinhoff's testimony, she complained to Solomon Makonnen, who was also a manager at Hooters. It is not clear from the trial testimony where in the hierarchy these individuals were or what authority they had, but Makonnen was higher than Bredenberg.

In any event, Steinhoff testified that, after she complained to Makonnen, he said that Gary McCully, the area supervisor for Hooters, would probably want to speak to her about the matter. However, she told Makonnen that she just wanted Bredenberg's conduct to stop and she did not want to speak with McCully.

According to Steinhoff's testimony, she had done her part by reporting the incident and she did not want to talk to McCully because she did not believe he would take it seriously.

In any case, as a result of her complaint, Steinhoff admits that Bredenberg's comments to her stopped for a period of time. She testified that after a while, Bredenberg "[went] back to his old behavior." (Trial Transcript 7/18/00 at p. 75). She testified that this confirmed her belief that the sexual harassment policy was not made to protect the waitresses, that complaints would not be kept confidential, and that the policy was only to protect management. (Id. at 50). Thus, according to the testimony, she believed that the policy was a sham, and she did not make any further complaints.

It is undisputed that the only time Steinhoff utilized the sexual harassment policy and top management[3] was made aware of the alleged sexual harassment, corrective action was taken. Steinhoff did not present any evidence that McCully, Jennifer Zmurk a general manager at that time, or any other members of "top management" were aware that Bredenberg had resumed making comments aimed at Steinhoff.

Steinhoff put on evidence via her own testimony that Bredenberg's harassment interfered with her job performance. Hooters did not put on any evidence contrary to this.

At the close of Steinhoff's evidence, and at the close of all the evidence, Hooters made a motion for a judgment as a matter of law (JAML[4]), pursuant to Fed.R.Civ.P. 50. Hooters argued that the plaintiff's evidence did not meet the criteria for sexual harassment and did not warrant an instruction on punitive damages. (Trial Transcript 7/18/00 at p. 110).

The court overruled the motion.

The jury returned a verdict for Steinhoff awarding her $25,000 in compensatory damages, and $250,000 in punitive damages.

Hooters has renewed its JAML motion post-trial. Fed.R.Civ.P. 50(c).

## ANALYSIS

This court should render a judgment as a matter of law only when " 'a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.' " *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105 (2000) (citing Fed.R.Civ.P. 50(a); *Weisgram v. Marley Co.*, 528 U.S. 440, 120 S.Ct. 1011, 1016–1018, 145 L.Ed.2d 958, (2000)). The court should review all evidence in the record and must draw all reasonable inferences in favor of the non-moving party. *Id.* at 2110 (citations omitted). The court may not make credibility determinations or weigh the evidence. *Id.* (citations omitted). Hence, "judgment as

---

**3.** Apparently the personnel policy was the function of the management company, but the evidence was sparse on how management functioned.

**4.** Formerly known as Judgment Notwithstanding the Verdict or Judgment N.O.V. Although the court is nostalgic for the Latin, the modern term will be employed.

a matter of law will be proper where 'there is no legally sufficient evidentiary basis for a reasonable jury to find for [the non-moving] party on that issue, [or where] a claim or defense ... cannot under the controlling law be maintained or defeated without a favorable finding on that issue.'" *Brickers v. Cleveland Bd. of Educ.*, 145 F.3d 846, 849 (6th Cir.1998) (citing Fed. R.Civ.P. 50(a)).

### A. Compensatory Damages

The current law of sexual harassment is dictated by the decision of the Supreme Court of the United States in *Burlington Industries v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

In *Ellerth*, the Supreme Court held that an employer will be liable for hostile environment sexual harassment by a supervisor, even if not condoned by upper management, unless the employer "exercised reasonable care to prevent and correct any sexually harassing behavior, and ... the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.* at 2270.

Several recent Sixth Circuit cases have interpreted *Ellerth* and other Supreme Court cases on sexual harassment. The most recent published decision is *Bowman v. Shawnee State Univ.*, 220 F.3d 456 (6th Cir.2000). *Bowman* contains an excellent summary of applicable principles.

> In order to establish a hostile work environment claim, an employee must show the following:
> 1) the employee is a member of a protected class, 2) the employee was subject to unwelcomed sexual harassment, 3) the harassment was based on the employee's sex, 4) the harassment created a hostile work environment, and 5) the employer failed to take reasonable care to prevent and correct any sexually harassing behavior. *See Williams v. General Motors Corp.*, 187 F.3d 553, 560–61 (6th Cir.1999).

A hostile work environment occurs "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (internal quotations and citations omitted). Both an objective and a subjective test must be met: the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively regard that environment as abusive. *See id.* at 21–22, 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295.

The court must consider the totality of the circumstances when determining whether, objectively, the alleged harassment is sufficiently severe or pervasive to constitute a hostile work environment. *See Williams*, 187 F.3d at 562. "[T]he issue is not whether each incident of harassment *standing alone* is sufficient to sustain the cause of action in a hostile environment case, but whether—taken together—the reported incidents make out such a case." *Id.* The work environment as a whole must be considered rather than a focus on individual acts of alleged hostility. *See id.* at 563. Isolated incidents, however, unless extremely serious, will not amount to discriminatory changes in the terms or conditions of employment. *See Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 790 (6th Cir.2000). Appropriate factors for the court to consider when determining whether conduct is severe or pervasive enough to constitute a hostile work environment "include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work perfor-

mance". *Harris,* 510 U.S. at 23, 114 S.Ct. 367.

*Bowman,* 220 F.3d at 461.

Both parties introduced abundant evidence on this theory, as summarized above.

The defendant also relies on the affirmative defense that it exercised reasonable care to prevent and correct promptly any sexually harassing behavior and that the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer.[5] Plaintiff counters with arguments and evidence to the effect that the sexual harassment policy was not seriously enforced as promulgated.

■ After careful review of the entire record, the court continues in the belief that, under the "totality of circumstances test" prescribed by *Bowman, supra,* and numerous other cases, these issues were for the jury, and the decision made by the jury concerning them was within the scope of its proper function. In sum, under the evidence supporting the verdict for compensatory damages the jury could have gone either way.[6]

The court cannot say that the $25,000 award by the jury for compensatory damages is excessive when balanced against the daily comments made to Steinhoff and the continual distress she testified she suffers. Thus, there was sufficient evidence to support the amount of compensatory damages awarded.

Therefore, the post-trial motions for judgment as a matter of law and for new trial with regard to the award of compensatory damages must be **denied.**

5. *Burlington Industries v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 2270, 141 L.Ed.2d 633 (1998).

6. The defendant also complains of various evidentiary rulings made by the court. The

## B. Punitive Damages

### 1. *Federal Law*

The issue of punitive damages is much more difficult and requires application of a different set of standards. For ordinary or compensatory damages, it is sufficient for the plaintiff to prove that she was subjected to a pervasive hostile environment on the job because of her sex. The employer's sexual harassment policy is only relevant as part of an affirmative defense. *See* discussion above.

The Supreme Court has made clear, however, that much more is required for recovery of punitive damages.

What is required is prescribed by another recent decision of the Supreme Court of the United States. This decision is *Kolstad v. American Dental Ass'n,* 527 U.S. 526, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999).

A careful reading of *Kolstad* yields the following principles.

1. Punitive damages in most federal civil rights claims are controlled by 42 U.S.C.1981a(b)(1), which reads:

"A complaining party may recover punitive damages under this section against a respondent ... if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual."

(2) * * * * *

(3) [imposes damages caps]"

2. **The Act does not authorize punitive damages in all cases of intentional discrimination.** *Kolstad,* 119 S.Ct. at 2124 (emphasis added).

3. Egregious misconduct by the employer is not required. *Id.* at 2126.

court has carefully considered all of these objections. Without enumerating them, the court has concluded that all of the rulings were discretionary in nature and any errors were harmless.

4. The Act focuses on the employer's state of mind. *Id.*

5. However, egregious misconduct can be evidence of the employer's state of mind. *Id.*

6. "The terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." *Id.*

7. "[A]n employer must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages." *Id.* at 2125.

8. "[A] positive element of conscious wrongdoing is always required." *Id.* at 2126 (citations omitted).

9. **Even if the above are met, however, liability does not follow unless the discriminatory conduct can be attributed to the employer under "agency principles."** *Id.* at 2127–8 (emphasis added).

10. In this regard, Restatement (Second) of Agency § 217 C controls all but a small portion of the analysis.[7] *Id.* at 2128.

11. Section 217 C provides that punitive damages may only be imposed on the employer if:

(a) the principal authorized the doing and the manner of the act, or

(b) the agent was unfit and the principal was reckless in employing him, or

(c) **the agent was employed in a managerial capacity and was acting in the scope of his employment,** or

(d) the principal or a managerial agent ratified or approved the act.

*Id.* (Emphasis added).

12. An employee must be important but need not be in top management to be acting in a "managerial capacity." *Id.*

13. In order not to discourage employers from familiarizing themselves with the law and having an anti-harassment policy, the Supreme Court modifies the above agency principles as follows:

"...**in the punitive damages context, an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's 'good faith efforts to comply with Title VII.'**" *Id.* (emphasis added) (citations omitted).

■ As applied to the present case, the most significant principle of *Kolstad* is that, for punitive damages liability, we look not to the discriminatory behavior of rank and file employees or even low-level supervisors, but only to persons who are "managerial agents."

Determining whether an employee is a "managerial agent" requires "a fact intensive inquiry." *Id.* at 2128.

■ "In making this determination, the court should review the type of authority that the employer has given to the employee, the amount of discretion that the employee has in what is done and how it is accomplished." *Id.* Examples in Restatement, Torts, Second § 909[8] suggest that an employee need not be the employer's "top management, officers or directors, to be acting in a managerial capacity." *Id.* (internal quotes omitted.)

As an indication of the level it had in mind, the Supreme Court refers to Illustration 3 of Restatement (Second) of Torts § 909. *Id.* This illustration indicates an operations manager who supervises the management of a series of retail stores is a "managerial agent."

Having reviewed many cases interpreting § 909 this court believes the following quotation exemplifies the correct criteria:

---

7. This section is identical to Restatement (Second) of Torts § 909, *infra.*

8. This section is identical to Restatement (Second) of·Agency § 217 C, *supra.*

"The fact that [an employee] described herself as a 'manager' is not evidence of the type of managerial capacity that the law requires to charge an employer punitively with the conduct of a managerial agent. **For such to occur, the managerial agent must be of sufficient stature and authority to have some control and discretion and independent judgment over a certain area of the business with some power to set policy for the company."**

*Fitzgerald v. Mountain States Tel. & Tel. Co.*, 46 F.3d 1034, 1045 n. 24 (10th Cir. 1995) (emphasis added) (citations omitted).[9]

■ The evidence of plaintiff shows that the only person that could have been found under the evidence to have shown malice toward her or reckless disregard for her federal rights was Bredenberg.[10]

The plaintiff introduced no evidence as to the authority of this individual, nor made any showing that he met the standards prescribed by Supreme Court for one acting in a "managerial capacity."

Therefore, there is a failure of proof as to an essential element for recovery of punitive damages, i.e., that Bredenberg was employed in a managerial capacity.

There is no evidence that any other person in defendant's management had any malice toward plaintiff or acted with reckless disregard for her federal rights or condoned Bredenberg's actions.

When plaintiff used the sexual harassment policy to make a complaint to persons above Bredenberg, they took action to stop the harassing conduct and it did, in fact, stop.

Although plaintiff testified it resumed, she admits that she did not make any

further complaint because she assumed it would be useless. However, plaintiff introduced no evidence that it would in fact be useless, much less that anyone higher than Bredenberg ignored her complaints or condoned his sexual harassment. Plaintiff's evidence shows that defendant's management never had notice that Bredenberg's conduct had resumed until after she was terminated.

Therefore, although the evidence justified an award of compensatory damages, the court is constrained to conclude that an award of punitive damages was not justified under the criteria established by *Kolstad, supra.* Therefore, the JAML must be granted for the punitive damages portion of the verdict.

An additional ground requiring the granting of this branch of defendant's motion is that, even if Bredenberg was vested with "managerial capacity", the evidence is unequivocal that his actions in harassing plaintiff were contrary to the "employer's good faith efforts to comply with Title VII." *See Kolstad, supra.*

For compensatory damages, the existence of an effective sexual harassment policy is an affirmative defense, which the defendant must prove. The court found in this case that, although there is no doubt there was a sexual harassment policy, the jury could find there was some negligence in enforcing it and/or that the plaintiff employee did not "unreasonably fail to take advantage of any preventive or corrective opportunities provided by the employer." *Ellerth,* 118 S.Ct. at 2270.

For punitive damages, however, someone higher than an agent acting in a "managerial capacity" must have failed to make "good faith" efforts to comply with Title VII. If the top management of the employ-

---

9. *Cf. Ogden v. Wax Works, Inc.,* 214 F.3d 999, 1010 (8th Cir.2000) (managerial agent managed several stores); *In the Matter of P & E Boat Rentals, Inc.,* 872 F.2d 642, 652 (5th Cir.1989) (first and second level supervisors not managerial agents; such agent must have policymaking authority).

10. The comments of Makonnen, while considered as part of the "totality of circumstances," for compensatory damages, are not a sufficient basis for punitive damages. Nor, was there any evidence of Makonnen's authority.

er did make such efforts, and the harassment by the "managerial agent" was "contrary" to them, there can be no punitive damages.

Apparently the Supreme Court in the use of the term "employer" in this context had reference to "top management" since the "employer" is above the "managerial agent." Top management in this case did have a sexual harassment policy. There was no evidence top management's efforts to comply with Title VII, as discussed above, were not in "good faith." Top management's efforts to stop the harassment were effective, and it had no notice that the harassment had started again.

### 2. State Law

■ Plaintiff also argues that she was entitled to punitive damages under state law. There is real doubt whether the Kentucky Civil Rights Statute authorizes punitive damages. An unpublished decision of the Kentucky Court of Appeals states that it does. *Kentucky Dept. of Corrections v. McCullough,* — S.W.3d —, 2000 WL 707953 (Ky.App. May 26, 2000). A recent unpublished decision of the United States Court of Appeals for the Sixth Circuit states that it does not. *Lewis v. Quaker Chemical Corp.,* 229 F.3d 1152, 2000 WL 1234356 (6th Cir. Aug.24, 2000) (Table). This court is, of course, bound by the Sixth Circuit decision. Therefore, punitive damages under Kentucky law is precluded by the Sixth Circuit precedent.

■ Moreover, the plaintiff did not request a punitive damages instruction under state law, and thus waived the issue. The transcript of the instructions conference clearly shows that the court proposed an instruction under federal law, taken from a form book for the Ninth Circuit. The parties accepted this instruction with an addition suggested by the defendant.

Therefore, no instruction having been requested under state law, which has radically different criteria for an award of punitive damages, including the requirement that they be proved by clear and convincing evidence, any claim for her punitive damages under the state statute has been abandoned. Fed.R.Civ.P. 51.

Further, the state statute requires a showing of oppression, fraud or malice, which must be proved by clear and convincing evidence for the imposition of punitive damages. The court holds that proof in accord with this standard was lacking.

The Kentucky punitive damages statute further provides that "In no case shall punitive damages be assessed against a principal or employer for the act of an agent or employee unless such principal or employer authorized or ratified or should have anticipated the conduct in question." Ky.Rev.Stat. Ann. § 411.184(3) (Michie 1992). As the above discussion indicates the plaintiff failed to prove this element by clear and convincing evidence.

The parties raise numerous other issues, most of which are mooted by the above disposition of the motions.[11]

Therefore, a separate order will enter denying the motion JAML on the compensatory damages, but granting it on the punitive damages.[12]

---

**11.** Not mooted is the issue of jury misconduct raised by the defendant. However, consideration of such issue is forbidden by Federal Rule of Evidence 606.

**12.** Pursuant to Fed.R.Civ.P. 50(c), the court rules that if the grant of the motion JAML is reversed on appeal, the motion for a new trial on the punitive damages award should be granted on the ground that such award is against the weight of the evidence.